**MEYLAN DAVITT JAIN AREVIAN & KIM LLP**
ROBERT L. MEYLAN (State Bar No. 144031)
BENEDETTO L. BALDING (State Bar No. 244508)
444 South Flower Street, Suite 1850
Los Angeles, CA 90071
Telephone:  (213) 225-6000
Facsimile:  (213) 225-6660
rmeylan@MDJAlaw.com
bbalding@MDJAlaw.com

**SCHLAM STONE & DOLAN LLP**
JEFFREY M. EILENDER (*Pro Hac Vice To Be Submitted*)
JONATHAN MAZER (*Pro Hac Vice To Be Submitted*)
SAMUEL BUTT (*Pro Hac Vice To Be Submitted*)
26 Broadway, 19th Floor
New York, New York 10004
Telephone:  (212) 344-5400
Facsimile:  (212) 344-7677
jeilender@schlamstone.com
jmazer@schlamstone.com
sbutt@schlamstone.com

Attorneys for Plaintiff Cesar Baez

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA: WESTERN DIVISION

| | |
|---|---|
| CESAR BAEZ, an individual,<br><br>        Plaintiff,<br><br>vs.<br><br>PENSION CONSULTING ALLIANCE, INC., and MICHAEL MOY,<br><br>        Defendants. | CASE NO. 2:17-cv-1938<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Action filed: March 2, 2017<br>Trial Date:   Not Set |

Plaintiff Cesar Baez ("Baez" or "Plaintiff"), by and through his undersigned counsel, Meylan Davitt Jain Arevian & Kim LLP and Schlam Stone & Dolan LLP, for his Complaint against Defendants, alleges as follows:

## OVERVIEW

1.    Plaintiff Cesar Baez sues for the destruction of the start-up business that he founded in 2006 and the destruction of his professional life.  Because of defendants, Mr. Baez went from being a millionaire to not having had a real job in more than five years and becoming destitute.  In this case, the false and/or reckless claims made by Defendant Pension Consulting Alliance, Inc. ("PCA") with respect to Plaintiff caused Baez great economic damage by forcing him out of the investment management business which he had spent most of his career developing.  He could not find commensurate employment due to the false accusations made by PCA and its principal or agent, Defendant Moy.

2.    Baez's business, although composed of various entities—some of which were owned solely by Baez and his business partners and some of which had other owners, including the California Public Employees' Retirement System ("CalPERS")—was usually referred to in public as "Centinela."  The investment management business relies heavily on the reputation of the managers.

3.    As part of its relationship with Centinela, CalPERS undertook due diligence by hiring PCA, a self-described investment consulting firm.  The principal at PCA who performed the background review of Centinela and it principals was Defendant Michael Moy.  During its most recent due diligence concerning Centinela, in connection with what was to be have been an award of a third fund by CalPERS to Centinela, PCA maliciously claimed to Centinela to have made a reference call to and relied upon William G. Clark, who had worked with Baez at the State of New Jersey Division of Investments ("State of New Jersey"), which is New Jersey's public employees' pension fund.  Notably, Moy never spoke to Clark himself, and instead relied upon a conversation Moy supposedly had with another PCA partner, Judy

Chambers, who herself purportedly spoke to Clark in early January 2011. Months later, well after the fact and to cover his tracks, Moy then maliciously drafted up a memo memorializing his conversation with Chambers about her purported conversation with Clark, which memorandum Baez did not obtain until on or about September 23, 2016, in the Baez CalPERS Action (defined below).

4.    However, Clark never had a reference call with Chambers about Baez and does not otherwise recall speaking to her about Baez. He also never made the statements attributed to him by PCA. Clark swore to this in a declaration in another action, *Baez v. California Public Employees' Retirement System*, Superior Court of the State of California, Los Angeles County Case No. BC498010 (the "Baez CalPERS Action"), attached hereto as Exhibit 1. In the Baez CalPERS Action, Plaintiff Cesar Baez sued CalPERS and its Chief Investment Officer, Joseph Dear, for tortiously interfering with Baez's existing agreements with his partners and future economic relations **with Centinela** and for discriminating against him because he was Latino, by forcing Centinela to terminate Baez as a member and employee of certain Centinela entities, costing him millions of dollars and destroying his career. The Baez CalPERS Action was recently dismissed on summary judgment, but Baez has filed a notice of appeal and designated the record. Should the Baez CalPERS Action be reinstated upon appeal, **nothing in this Complaint shall be construed as exonerating or exculpating CalPERS and Dear**.

5.    Chambers testified, on December 16, 2016, in the Baez CalPERS Action that she spoke to Clark concerning Baez in late 2010 or early 2011, but she also admitted she never told Clark the call was a reference call and the call lasted about 5 minutes. She further testified that much of what appeared in the memorandum Moy drafted supposedly setting forth the substance of Chambers' purported call with Clark was either inaccurate or not what she could recall about the purported call.

6.    Moreover, the information in the memorandum Moy prepared was false and could have easily been shown to be such. Indeed, the supposed information from

Clark about Baez contradicted what Baez relayed to PCA in a written response dated January 4, 2011, what other witnesses told PCA, and what PCA's own hired investigator found.  Nevertheless, PCA let CalPERS know that some of the information Baez provided had been contradicted by the supposed reference call with Clark, which was never mentioned in PCA's final report to avoid Freedom of Information Act requests.  Specifically, PCA told Dear at CalPERS, in a January 4, 2011, e-mail that "Cesar's input contradicted that received in the reference call."  When PCA, through Moy, told CalPERS that Baez was lying, when he was not, PCA lacked reasonable grounds for belief in the truth of the publication and therefore acted in reckless disregard of the Baez's rights.  Baez did not learn that PCA had done so until he received a document production in the Baez CalPERS Action on September 26, 2016.  The purported information from Clark that contradicted what Baez had told PCA in interviews was that Baez had left two previous employers, the State of New Jersey and Hicks, Muse, Tate & Furst ("Hicks Muse"), involuntarily, that Baez never closed on any investments while at the State of New Jersey, and that Baez had frequent contact with individuals associated with certain pay-to-play scandals.  Of course, because this was all false, as attested to in the Baez CalPERS Action by several individuals, including Clark, Charles Tate, a senior partner at Hicks Muse, and John McCormac, the former New Jersey State Treasurer, PCA was unable to confirm any of this information and did not try.

7.     Since Clark's supposed statements were never included in any PCA report, Baez did not learn of PCA's supposed call with Clark until Moy's August 26, 2016, deposition in the Baez CalPERS Action, and did not learn the identity of, or the details of the call with, Clark until after that date, as he was required to make a motion in the Baez CalPERS Action to require PCA to disclose its source and then to take a second day of testimony from Moy, on September 28, 2016.  As noted, Baez did not learn the identity of the supposed reference and did not know that PCA had told Dear that he had been contradicted, until just before the September 28, 2016 deposition of Moy.

8.     Despite having already determined that CalPERS could give Centinela two investment mandates, which CalPERS awarded to Centinela and which totaled nearly $1 billion, in connection with a third promised mandate, PCA determined, in conspiracy with CalPERS who wanted to get rid of Baez due to an animus Dear held against Baez or because PCA understood that CalPERS wanted to get rid of Baez and wanted to make its largest client happy or alternatively due to its own gross negligence and recklessness in failing to perform proper due diligence evidencing a willful avoidance of the truth, that CalPERS should not award a third mandate to Centinela unless Baez separated from Centinela.  The reason PCA ultimately gave for this recommendation was based on Baez's purported association with individuals involved in various pay-to-play scandals in New York and California not the false claims concerning involuntary departures from State of New Jersey and Hicks Muse, although a report concerning the CalPERS pay-to-play scandal prepared by Steptoe Johnson LLP did not mention either Baez or Centinela.  The "pay-to-play" scandal with respect to CalPERS concerned several insiders at CalPERS using their insider status to assist clients in gaining lucrative contracts from CalPERS.  The individuals involved included two prominent Hispanic individuals, CalPERS' then CEO, Fred Buenrostro, Jr., and Alfred Villalobos, a former CalPERS board member.  A similar scandal concerned New York State's pension fund, in which another prominent Hispanic individual, Julio Ramirez, was involved.  However, PCA had already told CalPERS that PCA had concluded (incorrectly) that Baez had lied to PCA in connection with its due diligence, including with respect to his relationship with the individuals involved in the pay-to-play scandals.

9.     What's more, PCA never determined the breadth of Baez's contacts with those accused in the pay-to-play scandals.  There was no reasonable ground, indeed there was no basis whatsoever, for the statement that Baez posed a reputational risk to CalPERS due to such contacts, as PCA concluded, particularly since those individuals were known to many people in the investment industry, other than the illegal and racially insensitive assumption that if some Latinos were involved in misconduct, other

MEYLAN DAVITT
JAIN AREVIAN & KIM LLP

Latinos in the same industry must also be involved.  Indeed, PCA concluded in a written report to CalPERS that its "review uncovered no evidence of wrongdoing" by Baez.  Baez only obtained his copy of the final PCA report to CalPERS during discovery in the related action against CalPERS and Dear, and such copy was produced on April 12, 2016.

10.   To be sure, the fix was in all along.  CalPERS was a crucial client for PCA and Moy knew all along that Dear had an animus against Baez and wanted an excuse to force him out of Centinela and to ultimately get rid of Centinela, which had another Latino partner, Vargas, altogether.  In other words, PCA knew that CalPERS had already reached a conclusion but needed cover to act and that in order to make CalPERS happy, PCA should present its analysis in such a way to support that conclusion.  Thus, in truth PCA's "investigation" was actually a conspiracy with Dear to provide a pretext to get rid of Baez and Centinela, or an exercise to support the result PCA knew the client wanted.  At best for PCA, and alternatively, it was a poorly conducted, slipshod, and reckless exercise evidencing a wilful avoidance of the truth that led to the destruction of the livelihood of man who has never been alleged to have engaged in any wrongdoing and who had told the truth in all his communications with PCA.

11.   Knowing what would be the effect of its actions on Baez's relationship with CalPERS and his own contracts with his partners at Centinela, with ill will or in reckless disregard of Baez's rights, PCA deliberately twisted its "analysis" so that there would be a recommendation by it to CalPERS that it would not be prudent to award a third mandate to Centinela unless Baez were separated from Centinela.  Accordingly, as was intended all along, Dear and CalPERS used the information from PCA as ammunition to make threats to Baez's two partners that they must get rid of him.  As a result, they terminated agreements to which the three partners were parties, Baez could no longer participate in their shared business, and as a result Baez lost his relationship with CalPERS and other pension funds.  This is classic tortious interference.

12.    That illegal, tortious, baseless and reckless conduct caused Baez damages in excess of $30 million, in the loss of salary and distributions he would have earned while working at Centinela, and the loss of value and reputation that both Centinela and Baez himself suffered as a result of PCA's actions.

## THE PARTIES

13.    Plaintiff Cesar A. Baez is a prominent Latino businessman.    Prior to founding Centinela Capital Partners LLC in 2006, Baez served as Head of Strategy of Institutional Business Development and Private Equity at Deutsche Bank Asset Management.    Earlier in his career, he took time off from his many lucrative private sector opportunities at a substantial reduction in compensation to serve as Head of Alternative Investments at the State of New Jersey Division of Investment, where he led the process at the staff level with the Investment Council of New Jersey to establish the first alternative investment program in the pension fund's modern history.    He has also served as a Member of the Advisory Board at Toigo Foundation, whose mission is to foster leadership development and career opportunities for diverse finance professionals.    In 2006, Baez was awarded the prestigious Ellis Island Medal of Honor. Baez holds a B.S. in Economics and Business Administration from Wagner College of New York, New York, and serves as an Adjunct Professor in the business school teaching a course in Alternative Investments.    Baez resides in and is a citizen of New Jersey.

14.    Defendant PCA is a corporation organized under the law of Delaware with its principal place of business in California.    At all times, PCA was acting as an agent of CalPERS.

15.    Defendant Michael Moy is a partner of PCA who resides in and is a citizen of California.

16.    Non-party CalPERS is an agency of the State of California.    CalPERS collects, invests, and pays out pension funds for the benefit of California's public employees.

**JURISDICTION AND VENUE**

17.    Jurisdiction is proper under 28 U.S.C. § 1332 since the action is between citizens of different States and the amount in controversy well exceeds $75,000.

18.    Venue is proper under 28 U.S.C. § 1391 in this district because, among other things, all Defendants reside in California, and because Defendants' improper and illegal actions took place in this district and interfered with contracts that were entered into and would have been performed in this district.

**FACTS COMMON TO ALL COUNTS**

**A.  CalPERS Awards Baez and Centinela a Mandate to Create a "Fund of Funds"**

19.    Centinela Capital Partners LLC was founded in 2006 by Baez and his two partners, Robert Taylor (an African-American) and Fidel Vargas (a Latino) in response to an Expression of Interest issued by CalPERS seeking to invest up to $500 million in a private equity "fund of funds" focusing on "emerging managers" and minority managers who were raising their first or possibly second institutional funds.  A "fund of funds" is a fund that invests in other funds.

20.    After an extensive competitive process, CalPERS awarded the Capital Link Fund I mandate to Centinela in October 2006.  At that time, Baez, Taylor, Vargas and CalPERS all understood that if Centinela's partners performed well, they would as a matter of course receive additional mandates from CalPERS.  CalPERS was so enthusiastic about Centinela that it also took a minority equity stake in Centinela Capital Holdings LLC and Centinela Capital Partners LLC.  Baez therefore committed himself to producing excellent results for CalPERS and for the people of California and their pension fund.

21.    As CalPERS itself admitted at the time, its partnership with Centinela was crucial to its goal of increasing diversity and to its obligation under California law to generate adequate returns:

> This venture with Centinela will enable us to seize new market opportunities created by significant population developments at the state and national levels . . . We believe we can gain a

competitive advantage by investment in emerging managers who bring fresh insights in how to generate returns in the market.[1]

22.    Because of Centinela's excellent results, CalPERS granted Baez, Taylor and Vargas a second investment mandate, in or around April 2008, and agreed to create Capital Link Fund II together with Baez, Taylor and Vargas.   PCA performed due diligence for this second mandate as well.

23.    Dear became CalPERS' Chief Investment Officer in March 2009.

**B. The Structure of Centinela, its Investment Advisors, Managers and Other Related Entities**

24.    There is no single entity that makes up the business referred to colloquially as "Centinela."  Rather, "Centinela" is made up of a variety of entities, all of which have different roles, different ownership structures and different legal backgrounds.

25.    Below is an organization chart setting forth the ownership interests and roles of each entity.  (Also attached hereto as **Exhibit 2**.)  As the Organization Chart demonstrates, Baez is a party to only two of the entities (and to the written contracts underlying those entities): Centinela Investment Partners LLC and Centinela Group LLC.  CalPERS is also a party to only two entities (and to the written contracts underlying those entities): Centinela Capital Partners LLC and Centinela Holdings LLC.

---

[1] *CalPERS commits $400M in New Equity Fund*, Sacramento Business Journal, October 30, 2006 at 2006 WLNR 18826749.

## Organizational Structure Chart Centinela

*Alignment of Interests -* The structure of CCP's General Partner and its affiliates are depicted below. Each entity is a Delaware limited liability corporation. Centinela GP, LLC ("CGP") and Centinela GP II, LLC ("CGP II") are the managers of Capital Link Fund I, LLC ("Fund I") and Capital Link Fund II, LLC ("Fund II") respectively, the $1 billion investment vehicles targeting emerging managers managed by the General Partner on behalf of CalPERS. Centinela Capital Partners, LLC ("CCP") is the investment advisor for Fund I and Fund II. Centinela Holdings, LLC ("CH") is the 100% owner of CGP. CalPERS owns 15% of each of CH and CCP. The remaining 85% of CH and CCP is owned by the principals of the General Partner (the "Principals") through Centinela Investment Partners, LLC ("CIP"), Centinela Share, LLC ("CS") and Centinela Group ("CG"), LLC respectively. The principals of the General Partner ownership stakes in each of CIP and CG is provided in footnote 3



MEYLAN DAVITT
JAIN AREVIAN & KIM LLP

26.    Any interference by PCA with the LLC operating agreements for these entities and with Baez's relationship with CalPERS would have—and did—gravely injure Baez.

### 1.    Centinela Investment Partners LLC

27.    Centinela Investment Partners LLC was originally created on January 17, 2007, with Baez as the sole initial member under a Limited Liability Company Agreement (with Taylor and Vargas added as members subsequently).  A true and correct copy of the Centinela Investment Partners LLC Agreement is attached hereto as **Exhibit 3**.  The only signatories to the Centinela Investment Partners LLC Agreement were Baez, Taylor and Vargas.

28.    Centinela Investment Partners LLC was designed to be the entity through which Baez, Taylor and Vargas beneficially owned and managed Centinela Holdings LLC.  As set forth in more detail below (and as is clear from the Organization Chart) Centinela Holdings was the manager of Centinela GP LLC and Centinela GP II, LLC, which were, respectively, the sole managers of Capital Link Fund I LLC and Capital Link Fund II LLC.

29.    The members of Centinela Investment Partners LLC were Baez, Taylor and Vargas alone. (*See* Ex. 3 at Schedule I).  Baez had a 36.50% interest in Centinela Investment Partners LLC,  Taylor had a 33% interest in Centinela Investment Partners LLC, and Vargas had a 30.50% interest in Centinela Investment Partners LLC (*See* Ex. 3 at Schedule I).

30.    The Members of Centinela Investment Partners LLC (namely, Baez, Taylor and Vargas only) were entitled to distributions from the LLC.  Under the Centinela Investment Partners LLC Agreement, the amount and timing of such distributions would be determined by the Board of Managers of Centinela Investment Partners LLC (and not the Board of Managers of any other Centinela affiliate).) (*See* Ex. 3 at 6.1(a)).

31.    The Centinela Investment Partners LLC Agreement further provides that the members would receive distributions from Centinela Investment Partners LLC

earned, in part, from the fact that Centinela GP, LLC and Centinela GP II, LLC (both owned by Centinela Investment Partners through Centinela Holdings) were the managers of Capital Link Fund I, LLC and Capital Link Fund II, LLC respectively. (*See* Ex. 3 at 6.1(b)).

32.    "Carried Interest Distributions" specifically included carried interest earned as a result of Centinela Investment Partners LLC's indirect management of Capital Link Fund I and Capital Link Fund II.  (*See* Ex. 3 at § 6.6), and indirect management of other prospective funds as well.

33.    "Distributable Cash" was defined, among other things, as including "carried interest" earned from the fact that Centinela GP, LLC and Centinela GP II, LLC were the managers of Capital Link Fund I, LLC and Capital Link Fund II, LLC respectively: (*See* Ex. 3 at § 6.6.)

34.    In brief, Baez's membership and 36.5% interest in Centinela Investment Partners entitled him to carried interest distributions and other distributions from Centinela Investment Partners.  Centinela Investment Partners was entitled to such distributions, as set forth below, because of its ownership interest in Centinela Holdings which was entitled to carried interest distributions and other distributions from Centinela GP LLC (the Manager of Centinela Link Fund I and Centinela Link Fund II) and Centinela GP II, LLC (the investment advisor of Centinela Link Fund I and Centinela Link Fund II), and would have distributions from managing funds for other pension funds.

### 2.    Centinela Group LLC

35.    Centinela Group LLC was created on December 12, 2007 pursuant to a written LLC Agreement (the "Centinela Group LLC Agreement") entered into between Baez, Taylor and Vargas.    A true and correct copy of the Centinela Group LLC Agreement is attached hereto as **Exhibit 4**.

36.    The purpose of Centinela Group LLC was to act as the manager of Centinela Capital Partners LLC, which served as the investment advisor to Capital Link Fund I and Capital Link Fund II.  (*See* Ex. 4 at § 1.3).

37.    Per the terms of the written Centinela Group LLC Agreement, the members of Centinela Group LLC were Baez, Taylor and Vargas alone. (*See* Ex. 4 at Schedule I). Baez had a 36.50% interest in Centinela Group LLC.  Taylor had a 33% interest in Centinela Group LLC.  Vargas had a 30.50% interest in Centinela Group LLC.  (*See* Ex. 4 at Schedule I).

38.    Also per the written terms of the Centinela Group LLC Agreement, the Members of Centinela Group LLC (namely, Baez, Taylor and Vargas only) were entitled to distributions from the LLC.  Under the Centinela Group LLC Agreement, the amount and timing of such distributions would be determined by the Board of Managers of Centinela Group LLC (and not by the Board of Managers of any other Centinela affiliate).  (*See* Ex. 4 at § 6.1).

39.    Distributable Cash was defined, among other things, as including management fees and other fee income earned by Centinela Group LLC and of its subsidiaries, including Centinela Capital Partners LLC.  (*See* Ex. 4 at § 6.6.)

40.    The Centinela Group LLC Agreement further provides that distributions would be distributed to members according to their membership interests.  (*See* Ex. 4 at § 6.1(b).)

41.    Distributable Cash from Profits Interests was defined in the Centinela Group LLC Agreement to include certain cash receipts received from the "Investment Advisor" (i.e., Centinela Capital Partners LLC, *see* Ex. 4 at § 1.3).  (*See* Ex. 4 at § 6.6).

42.    In brief, pursuant to the written terms of the Centinela Group LLC Agreement, Baez's membership and 36.5% interest in Centinela Group LLC entitled him to distributions from Centinela Group LLC.  Centinela Group LLC was entitled to such distributions, as set forth below, as a result of its ownership interest in Centinela

1  Capital Partners LLC and pursuant to the written terms of the Capital Link Fund I and
2  Capital Link Fund II LLC agreements.

3          **3.      Capital Link Fund I**

4          43.     Under the Capital Link Fund I, LLC Fourth Amended and Restated
5  Limited Liability Company Agreement (the "Fund I LLC Agreement"), a written
6  contract attached hereto as **Exhibit 5**, originally entered into on January 17, 2007, as
7  amended on October 12, 2011, the maximum duration of the fund was ten years. (*See*
8  Ex. 5).   The parties to the Fund I LLC Agreement were Centinela GP, LLC (the
9  "Manager" of Capital Link Fund I), CalPERS and Centinela Capital Partners, LLC (the
10 "Investment Advisor" of Capital Link Fund I. (*See* Ex. 5 at Preamble).

11         44.     Under the Fund I LLC Agreement, fees were due both to the Investment
12 Advisor and to the Manager.

13         45.     The Investment Advisor, Centinela Capital Partners LLC was due to be
14 paid management fees. As explained above, such fees would be passed up the corporate
15 chain to Centinela Group, LLC, and thus paid to Baez through the Centinela Group LLC
16 Agreement, to which only Baez, Taylor and Vargas were parties. (Ex. 5 at § 8.1).

17         46.     The Manager, Centinela GP, LLC was due to be paid carried interest.  As
18 explained above, such fees would be passed up the corporate chain to Centinela
19 Holdings LLC and then to Centinela Investment Partners, LLC, and thus to Baez
20 through the Centinela Investment Partners LLC Agreement, to which only Baez, Taylor
21 and Vargas were parties.

22         47.     "Carried Interest" was defined as "[t]he Manager's right to Distributions as
23 provided in Sections 4.2(a)(iii) and 4.2(a)(iv)(B)."  Those sections provide as follows:

24                 (a) Subject to Section 4.2(c) and 4.2(d), all Company
25         Proceeds shall be initially apportioned among the Members
           pursuant to their Percentage Interests . . . Subject to Section
26         4.2(i), amounts initially apportioned to the Manager, the
           Investment Advisor and to CalPERS in respect of its Special
27         Interest shall be distributed to the Manager, the Investment
           Advisor and CalPERS (in respect of its Special Interest)
28         pursuant to their respective Percentage Interests, and amounts
           apportioned to CalPERS in respect of its Ordinary Interest will

**MEYLAN DAVITT**
**JAIN AREVIAN & KIM LLP**

be distributed to CalPERS and the Manager in the following order of priority:

        (i) First, one hundred percent (100%) to CalPERS until it has received aggregate Distributions under this Section 4.2(a)(i) . . . equal to its Contribution Balance;

        (ii) Second, one hundred percent (100%) to CalPERS until CalPERS has received aggregate Distributions under this Section 4.2(a)(iii) equal to its Preferred Return;

        (iii) Third, one hundred percent (100%) to the Manager until the Manager has received aggregate Distributions under this Section 4.2(a)(iii) in an amount equal to six percent (6%) of all Distributions made to CalPERS and the Manager under Section 4.2(a)(ii) and this Section 4.2(a)(iii); and

        (iv) Thereafter, (A) ninety-four percent (94%) to CalPERS, and (B) six percent (6%) to the Manager. (*See* Ex. 5 at § 4.2).

## 4. Capital Link Fund II

48.    Under the Capital Link Fund II, LLC Fifth Amended and Restated Limited Liability Company Agreement (the "Fund II LLC Agreement"), a written contract attached hereto as **Exhibit 6**, originally entered into on April 1, 2008, as amended on October 12, 2011, the maximum duration of the fund was ten years. (*See* Ex. 6). The parties to the Fund II LLC Agreement were Centinela GP II, LLC (the "Manager" of Capital Link Fund II), CalPERS and Centinela Capital Partners, LLC (the "Investment Advisor" of Capital Link Fund II. (*See* Ex. 6 at Preamble).

49.    Under the Fund II LLC Agreement, fees were due both to the Investment Advisor and to the Manager.

50.    The Investment Advisor, Centinela Capital Partners LLC, was due to be paid management fees. As explained above, such fees would be passed up the corporate chain to Centinela Group, LLC, and thus paid to Baez through the Centinela Group LLC Agreement, to which only Baez, Taylor and Vargas were parties. (Ex. 6 at §8.1).

51.    The Manager, Centinela GP II, LLC was due to be paid carried interest. As explained above, such fees would be passed up the corporate chain to Centinela

Holdings LLC and then to Centinela Investment Partners, LLC, and thus paid to Baez through the Centinela Investment Partners LLC Agreement, to which only Baez, Taylor and Vargas were parties.

52. "Carried Interest" was defined as "[t]he Manager's right to Distributions as provided in Sections 4.2(a)(iii) and 4.2(a)(iv)(B)." Those sections provide as follows:

(a) Subject to Section 4.2(c) and 4.2(d), all Company Proceeds shall be initially apportioned among the Members pursuant to their Percentage Interests . . . Subject to Section 4.2(i), amounts initially apportioned to the Manager, the Investment Advisor and to CalPERS in respect of its Special Interest shall be distributed to the Manager, the Investment Advisor and CalPERS (in respect of its Special Interest) pursuant to their respective Percentage Interests, and amounts apportioned to CalPERS in respect of its Ordinary Interest will be distributed to CalPERS and the Manager in the following order of priority:

(i) First, one hundred percent (100%) to CalPERS until it has received aggregate Distributions under this Section 4.2(a)(i) . . . equal to its Contribution Balance;

(ii) Second, one hundred percent (100%) to CalPERS until CalPERS has received aggregate Distributions under this Section 4.2(a)(iii) equal to its Preferred Return;

(iii) Third, one hundred percent (100%) to the Manager until the Manager has received aggregate Distributions under this Section 4.2(a)(iii) in an amount equal to six percent (6%) of all Distributions made to CalPERS and the Manager under Section 4.2(a)(ii) and this Section 4.2(a)(iii); and

**MEYLAN DAVITT
JAIN AREVIAN & KIM** LLP

(iv) Thereafter, (A) ninety-four percent (94%) to CalPERS, and (B) six percent (6%) to the Manager. (*See* Ex. 6 at § 4.2).

### 5.   Centinela Capital Partners LLC

53.   Centinela Capital Partners LLC is the Investment Advisor to Capital Link Fund I and II.  Centinela Capital Partners LLC was created pursuant to a written LLC agreement, the Centinela Capital Partners LLC Agreement.  A true and correct copy of the CCP LLC Agreement is attached hereto as **Exhibit 7**.

54.   The members of Centinela Capital Partners LLC were CalPERS (which controlled a 15% interest in CCP) and Centinela Group, LLC (which controlled an 85% interest in CCP).  Baez was a party to the Centinela Group LLC agreement, the majority owner of Centinela Capital Partners LLC, and thus had an indirect interest in Centinela Capital Partners LLC.  As noted, as the Investment Advisor to Capital Link Fund I and II, Centinela Capital Partners LLC received management fees from Capital Link Fund I and II.

### 6.   Centinela Holdings LLC

55.   Centinela Holdings LLC was formed to serve as a member or partner of any entities formed to serve as general partners or managers of funds focused on private equity investment opportunities.  A true and correct copy of the Centinela Holdings LLC Agreement is attached hereto as **Exhibit 8**.  Thus, Centinela Holdings LLC was an intermediary entity in between Centinela Investment Partners LLC and Centinela GP LLC (the manager of Capital Link Fund I LLC) and Centinela GP II, LLC (the manager of Capital Link Fund II, LLC).

56.   The members of Centinela Holdings LLC were CalPERS and Centinela Partners LLC.   Baez was a party to the Centinela Investment Partners LLC agreement and thus had an indirect interest in Centinela Holdings.  As noted, Centinela Holdings received the carried interest from Capital Link Fund I and II.

**C.** **Capital Link Fund I Performs Well, and Consistent With The Parties' Original Understanding, Baez and Centinela Are Awarded a Second Investment Mandate: Capital Link Fund II**

57.    Capital Link Fund I performed well under Baez's leadership.

58.    As a result, in 2008, CalPERS awarded Baez, Taylor and Vargas a second, $500 million investment contract to form Capital Link Fund II.  Consistent with the understanding between CalPERS, Baez, Taylor and Vargas in 2006, the award was made without an open bid because the Centinela partners had performed so well. Capital Link Fund II operated under the same mandate as Capital Link Fund I:  to identify and invest in domestic, private equity, emerging and minority managers and also had a ten year duration.  The entities that managed and advised Capital Link Fund II are detailed above and in the Organization Chart.  Thus, by 2008, Baez and Centinela were managing nearly **$1 billion** for CalPERS.  PCA did the due diligence for CalPERS with respect to Capital Link Funds I and II.

59.    Capital Link Fund II achieved substantial net gains over the relevant time period for this case.  It is clear from this performance that Baez and CalPERS developed a strong working relationship and Baez with his two founding partners were doing well and were used by CalPERS as an example of working hand in hand to advance the cause of investing in emerging private equity managers and minority managers.  In fact, these initial performance results caused Centinela to be ranked among the top tier of comparable investment portfolios starting at that time, despite, among other things, the state of the economy since 2006, and the fact that Centinela's mandate was to invest in funds managed by individuals without a significant track record.  As of December 31, 2010, Capital Link Fund I and Capital Link Fund II were ranked in the first and second quartiles, respectively, among funds with the same starting years although it was early in the investment process and the capital was still being deployed.  By way of contrast, during the same time period, CalPERS's other investments lost nearly $90 billion – about 30% of their value.  In addition, Centinela developed several proprietary risk

management and reporting tools which were shared with CalPERS investment staff that other fund of funds had not developed.  The partners were congratulated and asked by staff to share their risk management and reporting tools to assist in helping CalPERS manage their other private equity investments.  CalPERS adopted some of Ceninela's procedures, such as the "Fund Submission" website.

**D. <u>Capital Link Fund III</u>**

60.    Starting in 2009, the Centinela partners and CalPERS had extensive discussions regarding a third investment contract, which would be called Capital Link Fund III.    At first, CalPERS indicated that, due to its superior performance and consistent with its past practice, Centinela would be awarded the third investment contract without competing in an open bid.  Indeed, per CalPERS' standard protocol, these discussions involved a lengthy due diligence process, which included a complete investigation by a third-party firm that CalPERS selected, PCA, who had also conducted due diligence with respect to Capital Link Funds I and II.

61.    Since this due diligence came at the time CalPERS was under scrutiny for its pay-to-play scandal and with Dear joining as a new Chief Investment Officer, this due diligence was one of the most complex investigations Moy had ever been involved in.

62.    In this investigation, PCA acted as CalPERS' fiduciary and was CalPERS' agent.  Allan Emkin, PCA's 100% owner during the relevant time period, admitted in his deposition in the Baez CalPERS Action that PCA was CalPERS' fiduciary:

Q. Now is PCA – does PCA act in the capacity of a fiduciary for CalPERS?

A. Yes.

63.    During PCA's due diligence on the prior funds, Capital Link Funds I and II, and in connection with the due diligence for Capital Link III, it had reviewed all the relevant agreements concerning Centinela and its structure, including the Centinela Investment Partners, LLC agreement, the Centinela Group, LLC agreement, the Centinela Holdings, LLC agreement, and the Centinela Capital Partners, LLC

MEYLAN DAVITT
JAIN AREVIAN & KIM LLP

agreement.  Indeed, Moy testified at his depositions in the Baez CalPERS Actions as follows:

> Q. And did PCA get a chance to review all of those agreements that set up Centinela and establish those relationships with the Centinela entities and their founders and principals?
>
> A. Yes, we did.

64.    Upon information and belief, PCA was also aware that Centinela was deep into negotiations for funds from pension funds for Texas, Rhode Island, and Michigan municipal employees, but that if Fund III fell through or Baez were removed, that those funds would not go forward with Centinela due to the perceived damage.  In the end, CalPERS' failure to award Fund III to Centinela and the well-publicized forced departure of Baez caused Texas, Rhode Island, and Michigan not to go forward with funds with Centinela.

65.    Unbeknownst to Baez or his partners, during this time, Dear, who was appointed Chief Investment Officer in March 2009, harbored a deep-seated animus towards Baez and wanted him out of Centinela, or at the very least wanted to be seen as cleaning house following the CalPERS pay-to-play scandal.  PCA knew this and wanted to keep CalPERS, a very important and PCA's largest client, happy.

66.    Accordingly, during PCA's due diligence for Capital Link Fund III, it looked for information, however incredible it might be, to support CalPERS' and Dear's wishes.  Specifically, PCA claimed to have spoken, in early January 2011, to a source, William Clark, who was employed by the State of New Jersey at the same time as Baez and was Baez's supervisor.  Baez did not learn of PCA's supposed call with Clark until Moy's August 26, 2016, deposition, and did not learn the identity of, or many of the details of the purported call with Clark until after that date, as he was required to make a motion to compel in the Baez CalPERS Action to require PCA to disclose its source and then had to take second day of testimony from Moy, on September 28, 2016.  Indeed, PCA claimed to have made an oral confidentiality agreement with Clark not to disclose

him as a source, although Clark has attested differently, did not refer to him in its final report, and required the aforementioned motion and resulting court order be made before disclosing his identity.

67.    According to the memorandum Moy drafted months after Chambers purported to speak with Clark, Clark told PCA:

a) that there were issues as to whether Baez had left two prior employments, at Hicks Muse and the State of New Jersey, involuntarily;

b) that Baez had frequent contacts with individuals involved in pay-to-play scandals, both in California and New York;

c) that Baez never closed on any investments while at the State of New Jersey.

68.    A final point in the memorandum reflected that during the due diligence for Capital Link I, Orin Kramer, Chairman of the New Jersey State Investment Council, told someone at CalPERS that Baez had been terminated from his position at the State of New Jersey.  Moy testified during deposition in the Baez CalPERS Action that this was not something Clark supposedly told Chambers, but something he learned from either Joncarlo Mark or Leon Shahinian, CalPERS' employees at the time.  In their depositions in the Baez CalPERS Action, however, neither Mark nor Shahinian had any recollection of having such a call with Kramer or ever being told that Baez had been terminated from the State of New Jersey, much less representing that to Moy.

69.    As noted, Moy never spoke to Clark or Kramer or any of the parties mentioned in the purported memorandum.   The conversations were completely fabricated to meet the needs of Dear and CalPERS.

70.    On January 3, 2011, Moy sent Baez an e-mail asking him to describe his relationships with certain people or entities, including Julio Ramirez, David Loglisci, Al Villalobos, and Aldus Equity Partners, as well as the circumstances of his departures from, among others, the State of New Jersey and Hicks Muse.  Baez responded the next day with truthful, responsive, and accurate answers, all of which have been

corroborated.  Emkin commented that these answered appeared "pro forma" but never followed up.

71.    That a reference had purportedly provided information that contradicted what Baez had told CalPERS was conveyed to Dear by Moy in a January 4, 2011, e-mail.  Specifically, PCA told Dear at CalPERS, in a January 4, 2011, e-mail that "Cesar's input contradicted that received in the reference call."  Thus, PCA indicated to CalPERS that Baez had not been truthful.  When PCA, through Moy, told CalPERS that Baez was lying, when he was not, PCA lacked reasonable grounds for belief in the truth of the publication and therefore acted in reckless disregard of the Baez's rights.  Baez did not learn that PCA had told CalPERS that he had been lying (which he was not) until September 26, 2016, when PCA provided discovery in the Baez CALPERS Action.

72.    Clark's purported statements were contrary to what Baez and other witnesses told PCA and CalPERS.

73.    PCA, with CalPERS' knowledge, agreement and approval, hired a second company, Control Risks, to perform additional due diligence, but completely ignored Control Risks' findings that contradicted what Clark had purportedly said or failed to confirm his alleged statements.  PCA never found any information that contradicted what Baez told it in his written responses dated January 4, 2011, in connection with its due diligence, and also intentionally failed to investigate or willfully ignored information that corroborated Baez.

74.    In a February 1, 2011, report, Control Risks wrote it was unable to confirm Clark's purported statements that Baez left Hicks Muse or the State of New Jersey involuntarily.

75.    Instead, according to Control Risks' report, a senior official from New Jersey told Control Risks that Baez left voluntarily.

76.    As either PCA, or its agent Control Risks, could have easily found out, any statements that Baez left Hicks Muse or the State of New Jersey involuntarily were

materially false and Baez's description of the circumstances of his departure from those entities to Moy were truthful.   Both the State Treasurer of New Jersey during the relevant time, John McCormac, and the Assistant State Treasurer during the relevant time, Gerville Gibbs, unequivocally confirmed in sworn declarations, attached hereto as Exhibits 9-10, in the Baez CalPERS Action that Baez left the State of New Jersey voluntarily and on good terms and that there is no way he could have been terminated without their knowledge.  Both McCormac and Gibbs were Clark's superiors.  Control Risks appears to have spoken to at least one of these individuals, but PCA failed to take notice since that would undercut the result PCA was trying to reach for CalPERS since it knew Dear and CalPERS wanted Baez out.

77.    Further, the Control Risks report states that Baez left Hicks Muse in 2001 when the firm's Latin America fund was hit hard by the perceived economic troubles at the time in Latin America.  Again, PCA failed to take notice, and instead claims to have relied upon Clark's supposed statements that, if made, were uncorroborated.  Again, PCA could have easily confirmed that any statement that Baez left Hicks Muse involuntarily was incorrect by speaking with someone at Hicks Muse, as this firm did, when it spoke to Charles Tate, Baez's immediate superior.  PCA chose not to do so since undertaking such a standard investigation ran the risk of requiring PCA to conclude there would be no issue with Baez remaining at Centinela, the opposite of the result CalPERS and PCA wanted to reach.

78.    In a sworn statement, attached hereto as Exhibit 11, one of the founders of Hicks Muse, Charles Tate, confirmed that Baez left voluntarily to pursue other opportunities and on good terms.

79.    Clark's supposed statements about Baez's leaving of Hicks Muse and the State of New Jersey were also contrary to what PCA found during its due diligence for Capital Link Funds I and II, but again these earlier findings were ignored.

80.    PCA could also have confirmed that Baez did indeed close on investments while at New Jersey.  As Mr. Gibbs has sworn, he and Baez approved of and made first

commitments of $1.5 billion worth of investments while Baez was at the State of New Jersey. New Jersey uses the Alternative Investment Management ("AIM") program Baez set up to this day.

81.    Both Ramirez and Loglisci have submitted sworn declarations in the Baez CalPERS Action, attached hereto as Exhibits 12-13, that contradict the statements concerning them that Clark purportedly made. Ramirez swore that he had attended only one meeting with Baez while Baez was at the State of New Jersey, contrary to Moy's statement in his memo. Loglisci swore he never had frequent contracts with Baez.

82.    Baez, on January 4, 2011, described to PCA his relationships with Ramirez and Loglisci as follows:

> Julio Ramirez is someone who has been known to the firm prior to the formation of C[entinela] C[apital] P[artners]. All of us have had some interaction with Julio even prior to his entering the placement agent business. I specifically met Julio while at New Jersey and while I did not recommend any of the funds he was representing at the time, we remained friends. CCP selected funds that Park Hill represented where Julio was a Partner in 2007-08 (see DDQ). Post his departure we have had some contact with Julio on a social basis.

> I met David Loglisci in 2004 while I was head of Alternatives at the State of New Jersey and he had a similar position at New York State Common Fund. We met while I was setting up the program for New Jersey and I reached out to several large public plans including CalPERS to provide me with their experiences with their programs including policies and procedures, references on consultants, General Partners, industry overview and portfolio information. After my departure from the State of New Jersey in 2005, I remained in contact with Loglisci while at Deustche Bank Asset Management but never transacted any business with Loglisci or NYCRF. Post his departure from NYCRF, Loglisci was hired as a consultant by Stonetower Capital (a firm founded by Michael Levitt formerly of Hicks Muse) and where we sublet office space. Additionally for a short time we (CCP and Stonetower)) considered a proposal from [him] to partner up in a co-investment fund which we evaluated and passed on. David was a consultant with Stonetower until November 2007 when his assignment was terminated at Stonetower. Post that time I have had little contact with David Loglisci.

Both Ramirez and Loglisci swore in their declarations that Baez's description was accurate.

83.    Ultimately, to support CalPERS' desired result, based either on Dear's animus or his desire to be seen cleaning house in the wake of the CalPERS pay-to-pay scandal, and either in conspiracy with Dear and CalPERS or simply to reach the result

PCA knew its important client wanted, PCA maliciously, with ill will or in reckless disregard for Baez's rights, drummed up and claimed to rely upon purported statements by Clark that were easily discredited and the improper assumption that if some Latinos were involved in misconduct, other Latinos in the same industry must also be involved. PCA thereby gave CalPERS cover by "recommending" CalPERS should go forward with Capital Link Fund III only if Baez separated from Centinela because PCA concluded Baez had not been truthful, which view was communicated to Dear, and for the reason stated in its report based on his supposed relationship with individuals in the pay-to-pay scandal.

84.    Further, PCA knew or should have known Clark had an ax to grind with respect to Baez.  Clark was against hiring anyone new at the State of New Jersey and very much against instituting an AIM program, the program Baez was brought in by the State Treasurer to spearhead at the State of New Jersey.  This should have prompted PCA to conduct a further inquiry and to contact the individuals this firm has, namely McCormac, Gibbs, Tate, Ramirez, and Loglisci, all of whom demonstrate that the information in Moy's memorandum were false.

85.    In the alternative, PCA's due diligence was conducted in a grossly negligent and reckless manner in willful disregard for the truth or with malice in that they failed to follow up or investigate points that were easily confirmed and otherwise ignored the sheer weight of information that would have contradicted what Clark purportedly told PCA.  PCA's grossly negligent, reckless or intentionally shoddy investigation caused Baez substantial harm in that by telling CalPERS that Baez had not been truthful, or that he could be seen to be a reputational risk, PCA caused CalPERS to demand Baez's ouster.

86.    Thus, PCA's actions were taken with ill will, in that they were known to and were intended to injure Baez, or because PCA lacked a reasonable ground for its belief and therefore such actions were taken in reckless disregard of Baez's rights.

87.    PCA had the ability to supervise Moy's investigation on Capital Link Fund III, to direct his conduct, and to fire Moy.  Emkin admitted in his deposition to not supervising Moy's investigation of CalPERS in any way, despite the obvious red-flags. He further admitted that he "did not take any actions to look at the quality of [Moy's] due diligence."

88.    Emkin also admitted that it was a mistake for PCA to rely on the purported conversation with Clark:

A. We took Bill Clark at face value.

Q. Was that a mistake?

A. …[I]n retrospect, it was a mistake.

Q. Why was that a mistake?

A. Because some of the representations may not have been accurate.

89.    As discussed, CalPERS was a crucial client for PCA and Moy knew all along that Dear had an animus against Baez and wanted an excuse to force him out of Centinela and to ultimately get rid of Centinela, which had another Latino partner, or to otherwise be seen as cleaning house after the CalPERS pay-to-play scandal.  In other words, PCA knew that CalPERS had already reached a conclusion but needed cover to implement its desire to oust Baez and that in order to make CalPERS happy, PCA should undertake its investigation and present its analysis in such a way to support that conclusion.  Thus, in truth PCA's "investigation" was actually a conspiracy with Dear or pre-ordained to keep CalPERS happy by providing a pretext to get rid of Baez and Centinela, carried out maliciously, with ill will or in reckless disregard for Baez's rights.

90.    At best for PCA, and in the alternative, PCA's due diligence was a sloppily performed, grossly negligent, and reckless undertaking evidencing a willful avoidance of the truth that caused Baez substantial harm.

91.    Both PCA and CalPERS knew of the great damage the ouster of Baez, the founder of Centinela, would cause both Centinela and Baez.

92.    PCA included nothing in its final due diligence report relating to Capital Link Fund III, dated June, 21, 2011 about how Baez purportedly left his previous positions.  The final PCA report left out positive comments made about Baez seen in the many drafts prior to the final draft.

93.    Rather, PCA's final report noted that Baez's "professional and personal affiliations include several individuals named or convicted of felonies in connection with the 'pay to play' scandals of 2009."  PCA went on to state in the report that "[t]he extent and depth of these relationships, which could be problematic, could not be determined."  Of course, nearly everyone in the pension and investment community would have connections to Buenrostro and Villalobos, the CalPERS CEO and a board member, respectively, of the largest pension fund in the United States, and Loglisci, the Chief Investment Officer of New York's pension fund, the second largest in the country.  Baez only obtained his copy of the final PCA report to CalPERS during discovery in the related action against CalPERS and Dear, and such copy was produced on April 12, 2016.

94.    Nevertheless, and inconsistent with the statement that it could not determine the "extent and depth" of the relationship, PCA concluded, "[w]hile PCA's review uncovered **no evidence of wrongdoing**, the breadth of these relationships may be perceived as a reputational concern."  Again, this supposed "concern" was simply a pretext to support Dear's preconceived and improper desire to oust Baez from Centinela and based on reports made up by PCA.

95.    On information and belief, the fact that Baez is Latino, like many of the individuals under investigation in connection with the pay-to-play scandals, played a major role in Dear's, and thus, PCA's decision.  In short, the decision to oust Baez was a straightforward example of racial profiling and bias: because some Latinos had been suspected of misconduct, Dear and PCA assumed that all Latinos in the same business had to be part of a ring of influence peddlers and any association would lead to

reputational harm to CalPERS. This assumption that Latinos were corrupt was false, offensive and illegal.

96.    Because the issue had been predetermined by Dear and supported by PCA's intentionally lackluster or grossly negligent and reckless investigation with its pre-ordained "recommendation", without waiting for the final report which was submitted in June 2011, on February 14, 2011, at a meeting at which Moy was present and in which he actively participated, CalPERS and Dear demanded Baez's removal from Centinela as a requirement of awarding Capital Link Fund III to Centinela, claiming, during the meeting and follow up calls, a "fitness and judgment issue" with respect to Baez, and stating that there needed to be a change in Centinela's "leadership structure at the top," as was determined by PCA based on falsities. Further implicit in this threat was that if Baez was not terminated, CalPERS would use its discretion under the relevant agreements to terminate its entire relationship with Centinela under the no-fault termination provisions of the Capital Link I and II agreements, and thus destroy it. Indeed, at one point Real Desrochers of CalPERS made this threat explicit. At a June 29, 2011, meeting with Taylor and Vargas, Desrochers stated that, if Baez remained with Centinela, CalPERS would exercise its rights under the no-fault termination provisions of the Capital Link I and II agreements.

97.    During the February 14, 2011 meeting, Moy mentioned several individuals associated with the pay-to-play scandals, including Villalobos, Buenrostro, and Ramirez. Although other names were mentioned, Moy focused on the Latino individuals.

98.    Moy conveniently never mentioned to Baez, Vargas, or Taylor that he had told CalPERS that PCA thought Baez was lying or had been contradicted by a source.

99.    Baez, Taylor and Vargas proposed an alternative on behalf of Centinela, which has since been referred to as the "failsafe" intended to address CalPERS' concerns if those concerns were about reputation rather than ethnicity, but CalPERS, with PCA's encouragement, rejected the proposal.

100.   Under the "failsafe proposal" certain triggering events would, among other things, cause the offending party to immediately cease any involvement with Centinela's daily activities and have removal proceedings started against him.

101.   Nevertheless, PCA, because it knew that Dear did not want to compromise, determined and recommended that CalPERS should reject the failsafe proposal as unsatisfactory since it did not provide for Centinela's complete separation from Baez.

**E. Baez Is Forced Out of Centinela; PCA Tortiously Interferes with the Baez's Prospective Economic Relations With CalPERS**

102.   Taylor and Vargas folded under the incalculable pressure imposed on it by CalPERS and PCA.  Under the weight of that economic duress, they urged Baez to go quietly.  Similarly, also under the weight of economic duress, namely the threat from CalPERS that he had to leave or CalPERS would destroy Centinela, Baez agreed to sign a Separation Agreement, which became effective on September 30, 2011, and irrevocably separated Baez from the various Centinela entities to which he was a party, including Centinela Investment Partners LLC, Centinela Group LLC, the Centinela Holdings, LLC Agreement, and the Centinela Capital Partners, LLC Agreement (the "Separation Agreement").  A true and correct copy of the Separation Agreement is attached hereto as **Exhibit 14**.  The agreement was between Vargas, Taylor, and Baez, together with Taylor as the manager of the other Centinela entities.

103.   To be sure, Baez and his partners were coerced into entering this agreement under duress.  Indeed, Baez had no reasonable alternative other than to agree to the contract since otherwise Centinela would have been destroyed.

104.   On the face of the Separation Agreement it is clear that the purpose that agreement was to disrupt Baez's contracts with his partners at Centinela and his relationship with CalPERS.  The Separation Agreement states that "[t]his letter agreement . . . sets forth the terms and conditions of the separation of Baez from Centinela." (*See* Ex. 14 at 1).  Further, it specifically describes the agreements being broken by the Separation Agreement, including the Centinela Investment Partners LLC

Agreement, the Centinela Group LLC Agreement, the Centinela Holdings Agreement and the Centinela Capital Partners Agreement. (*See* Ex. 14 at 1).

105.   The Separation Agreement fundamentally disrupted the agreements that formed Baez's relationship with Centinela and CalPERS, including the Centinela Investment Partners, LLC Agreement, the Centinela Group, LLC Agreement, the Centinela Holdings, LLC Agreement, and the Centinela Capital Partners, LLC Agreement.

106.   First, Baez's rights to "Carried Interest" from the Centinela Investment Partners LLC Agreement was cut off, other than for Capital Link Funds I and II:

> (a)   Carried Interest. Baez will continue to participate in Distributable Cash received by Centinela Investment Partners . . . but only in respect to such Carried Interest Distributions received, if any, from each of the Legacy Funds . . **. Baez shall not have any interest in any other Carried Interest Distributions as defined in the CIP LLC Agreement, including, but not limited to, any such distributions attributable to any investments or activities of Centinela associated with any investment mandate, commitment or arrangement with [CalPERS]** other than the Legacy Carried Interest.

107.   Second, the Separation Agreement cut off Baez's right to certain investment distributions:

> (b)   Investment Distributions. Baez will continue to participate in Distributable Cash received by Centinela Investment Partners in respect of Investment Distributions (as such terms are defined in the CIP LLC Agreement) but only in respect of such Investment Distributions received, if any, from each of the Legacy Funds. Such distributions shall be payable at the same time as distributions of the same type are made to the Managing Directors of their successors in interests as individual members of Centinela Investment Partners, as the case may be, and shall be subject to the Continuing Clawback Obligation. Baez's proportionate share of such distribution shall be 36.5%. **Baez shall not have any interest in any other Investment Distributions as defined in the CIP LLC Agreement, including but not limited to, any such distributions attributable to any investments or activities of Centinela associated with any investment mandate or commitment from or other arrangement with CalPERS (other than the Legacy Funds) or any other investor or client**. (*See* Ex. 14 at 2).

108.   Third, the Separation Agreement cut off Baez's rights to any other "Distributable Cash" of Centinela Investment Partners:

(c)   Other Distributions under CIP LLC Agreement or Sale of Centinela Investment Partners.   Baez shall not have any interest or right to any other Distributable Cash of Centinela Investment Partners; provided however, that in the event of a sale by Centinela Investment Partners of its interest in the Legacy Funds, or its interest in the right to receive the Specified Other Carried Interest, if any, Baez shall receive his proportionate share of such proceeds net of all associated costs of the transaction at issue, based on his percentage interest in distributions to which such interests related as specified in Sections 1(a) and 1(b).  In the event of a sale of all the membership interests in Centinela Investment Partners by the holders thereof, Baez's share of the proceeds of any such sale attributable to his remaining interest in Centinela Investment Partners shall be determined as though Centinela Investment Partners sold all of his assets to a third party and liquidated, in which event Baez shall be entitled to receive his proportionate share of the liquidation proceeds (net of all associated costs of the transaction at issue), attributable to the Legacy Carried Interest, Specified Other Carried Interest and Investment Distributions from the Legacy Funds based on his percentage interest in distributions to which the sold interests relate as specified in Sections 1(a) and 1(b).

109.   Fourth, the Separation Agreement cut off Baez's rights to certain Profits Interests distributions under the Centinela Group LLC Agreement:

(a) Distributable Cash from Profits Interests. Baez will continue to participate in Distributable Cash from Profits Interests (as such term is defined in the CG LLC Agreement), but only in respect of such Distributable Cash from Profits Interests generated from each of the Legacy Funds (the "Legacy Profits Interest"). For this purpose, the Percentage Interest of Baez in the Legacy Profits Interest shall, notwithstanding the formula set forth in the CG LLC Agreement, be fixed at 36.5%. Such distributions shall be payable at the same time as distributions of the same type are made to the Managing Directors or their successors in interest as individual members of Centinela Group, as the case may be, and shall be subject to the Continuing Clawback Obligation. For purposes of determining the portion of Distributable Cash from Profits Interests generated from each of the Legacy Funds, any expenses or reserves for expenses, debt payments and other expenditures or contingencies of Centinela Group (or of Centinela Capital Partners) shall be allocated among Distributable Cash from Profits Interests generated by each of the Legacy Funds and other revenue sources giving rise to Distributable Cash of such entities in proportion to the amount of Distributable Cash from Profits Interests generated by each of the Legacy Funds and such

other revenue sources; provided, however, that in no event shall more than an aggregate of $1.1 million of cash compensation (including salary and bonus) expense per annum paid to the Managing Directors or their successors in interest by Centinela Capital Partners (together with each of the other entities comprising or affiliated with Centinela) be taken into account to reduce Distributable Cash in respect of any calendar year if the effect of such allocation would reduce Baez's allocable share of the Legacy Profits Interest. By way of illustration only, if in a particular year, Centinela Capital Partners generates or incurs:

110.    Fifth, the Separation Agreement cut off Baez's rights to certain Distributable Cash under the Centinela Group LLC Agreement:

**(b)    Other Distributions under CG LLC Agreement or Sale of Centinela** Baez shall not have any interest or right to any Distributable Cash of Centinela Group other than as expressly provided in Section 2(a) in respect of the Legacy Profits Interest; provided, however, that in the event of a sale by Centinela Group (or Centinela Capital Partners) attributable to (or of) its interest in the Legacy Funds, Baez shall receive his proportionate share of such proceeds (net of all associated costs of the transaction at issue) allocable to the Legacy Profits Interests, based on his percentage interest in distributions to which such interests relate as specified in Section 2(a). In the event of a sale of all of the membership interests in Centinela Group by the holders thereof, Baez's share of the proceeds of any such sale attributable to his remaining interest in Centinela Group shall be determined as though Centinela Group sold all of its assets to a third party and liquidated, in which event Baez shall be entitled only to receive his proportionate share of the liquidation proceeds attributable to the portion thereof relating to Distributable Cash from Profits Interests relating to the Legacy Funds (net of all associated costs of the transaction at issue) based on his percentage interest in such distributions to which the sold interests relate as specified in Section 2(a). For the avoidance of doubt, Distributable Cash in respect of the Legacy Profits Interest shall be determined after all expense and loan related payments (including, but not limited to, under that certain Herald National Bank facility) and any distributions made by Centinela Capital Partners to CalPERS (including, but not limited to, in respect of that certain Priority Distribution Amount (as defined in the CCP LLC Agreement)) from time to time have been taken into account.

111.    Sixth, Baez was deprived of salary and compensation:

3.    <u>Compensation.</u>  As of August 1, 2011, Baez will cease to receive or be entitled to receive or accrue any salary or other compensation from Centinela Capital Partners or any other entity affiliated with Centinela, whether paid currently or deferred from Centinela Capital Partners or any other entity affiliated with Centinela. For the avoidance of doubt, Baez

hereby acknowledges that he has no rights to compensation previously deferred or otherwise not paid due to financial performance of Centinela Capital Partners and its Affiliates.

112.   Seventh, Baez was deprived of his membership interests in Centinela Group LLC and Centinela Investment Partners LLC, and reduced to nonvoting status with no rights to management:

### Status as Employee. Member. Manager. and Officer; Amendments to Governing Documents.

Effective as of the Effective Date, Baez acknowledges and the parties hereto agree that (a) Baez's existing membership interests in Centinela Group and Centinela Investment Partners shall automatically be deemed to have been converted into nonvoting membership interests reflecting the economic terms provided herein, (b) Baez shall no longer be an employee of Centinela Capital Partners, or serve as or be a member of the Board of Managers of or an officer of Centinela Group, Centinela Investment Partners and any other entities comprising or affiliated with Centinela, (c) Baez shall cease to have any voting rights as a member of Centinela Group and Centinela Investment Partners and shall not thereafter participate in the management of Centinela Group and Centinela Investment Partners and any other entities comprising or affiliated with Centinela or have any management rights under any of the Centinela LLC Agreements [which is defined to include the Centinela Investment Partners LLC Agreement, the Centinela Group LLC Agreement, the Centinela Holdings Agreement and the Centinela Capital Partners Agreement], (d) Baez shall be treated as a non-voting partner of Centinela Group and Centinela Investment Partners solely for federal and other applicable income tax purposes and until his rights to distributions as specified herein and clawback obligations have been satisfied or discharged or are otherwise no longer applicable, and (e) subject to the receipt of the consent of CalPERS as contemplated by Section 17 hereof, Baez shall no longer be deemed a "Key Person" under applicable provisions of the Centinela LLC Agreements from and after the Effective Date. Without limiting the foregoing, from and after the Effective Date, the Managing Directors may amend or restate any of the Centinela LLC Agreements to reflect such provisions, the revised arrangements specified herein and other matters deemed appropriate by the Managing Directors, including but not limited those attendant upon the admission of one or more additional members or related to matters not involving Baez or this letter agreement, provided that such amendments and restatements shall not, without Baez's written consent, diminish the obligations of Centinela Group and Centinela Investment Partners under this letter agreement or to furnish Baez with the benefits and distributions set forth herein. For the avoidance of doubt, in the absence of such amendments and restatements, the Centinela LLC Agreements

shall continue to apply and be binding upon the parties hereto in accordance with their existing terms as modified by this letter agreement which shall be treated as an amendment to the Centinela LLC Agreements. Further, following the Effective Date, at the request of Centinela Group or Centinela Investment Partners to meet its business requirements, the parties shall mutually and in good faith determine possible alternatives for restructuring the manner in which Baez holds record title to his continuing economic interest in Centinela Group and Centinela Investment Partners as expressly specified herein, including but not limited to by way of use of an escrow or paying agent, nominee or other entity formed for Baez's benefit to hold or administer his rights to distributions under Sections 1 and 2 hereof, and Baez agrees not to unreasonably withhold or delay his consent to and implementation of any such alternative arrangement.

113.   Moreover, as recognized in § 17 of the Separation Agreement:

This letter agreement is subject in its entirety to the receipt of the prior written or verbal consent of CalPERS to the transactions contemplated hereby on or before October 15, 2011 in the form acceptable to the Managing Directors and confirmation that CalPERS has accepted the management plan of the Managing Directors in respect of the ongoing management of the Legacy Funds, will not be exercising rights, if any, or otherwise attempting to cause a modification or termination of the arrangements currently in place in respect of the Legacy Funds, Centinela Holdings or Centinela Capital Partners on a basis that is not acceptable to the Managing Directors and will not consider Baez to constitute a "Key Person" under applicable Centinela LLC Agreements from and after the Effective Date. Promptly following the execution of this letter agreement, the parties shall in good faith seek appropriate written amendments or waivers from CalPERS to applicable provisions of the [Centinela Capital Partners, LLC Agreement, the Centinela Holdings LLC Agreement and other agreements] to effectuate the terms contained and transactions contemplated herein.

114.   Under the Centinela Capital Partners, LLC Agreement, the company would distribute Company Proceeds within 30 days of receipt. (Ex. 7 at § 7.2(b)). Both Capital Link Fund I and II paid a management fee to Centinela Capital Partners, LLC, which would have then been distributed to Centinela Group, LLC, and then, as set forth above, paid to Centinela Group, LLC's members. PCA's actions caused Baez to be lose his indirect interest in Centinela Capital Partners, LLC, together with his attendant relationship with CalPERS.

115.   Under the Centinela Holdings, LLC Agreement, the company would distribute Company Proceeds within 30 days of receipt.  (Ex. 8 at § 7.2(b)).  Both Capital Link Fund I and II paid carried interest to Centinela Holdings LLC, which would have then been distributed to Centinela Investment Partners, LLC, and then, as set forth above, paid to Centinela Investment Partners, LLC's members.  PCA's actions caused Baez to lose his indirect interest in Centinela Holdings, LLC, together with his attendant relationship with CalPERS.

116.   The fact that Baez was summarily removed from the various Centinela entities quickly became public and created an immediate cloud over him because of CalPERS' pernicious spin.  For example, a newspaper article appearing in March 2012 explained that Baez had been "forced out," and quoted Dear as saying that Baez had a "fitness issue" (although he declined to explain what it was) thus creating a cloud over Baez and that CalPERS could not proceed with Centinela unless there was a leadership change.[2]

**F. PCA Destroys Baez's Business.**

117.   Despite CalPERS promise that, if Taylor and Vargas improperly forced Baez to leave CalPERS would grant Centinela a contract to manage Capital Link Fund III, CalPERS in fact did not select Centinela for that contract or for any other contract. Shortly after Baez was forced out, CalPERS eliminated Centinela from the competition for the investment contract by invoking a criteria at the last minute it knew would eliminate Centinela.  CalPERS later also invoked the no-fault termination provisions with respect to Capital Link Funds I and II, effectively destroying Centinela.

118.   Baez's business as an investment manager has been destroyed by PCA's conduct.  A key factor that investors look to when deciding to hire an investment manager is the firm's and the manager's stability and reputation in the marketplace. That reputation was improperly put into doubt by PCA and the resulting separation it

---

[2] Christopher Witkowsky, *Centinela Loses Bid for CalPERS Mandate*, Private Equity International, March 2, 2012.

and CalPERS required.  Baez was separated under a cloud, even though PCA knew, or should have known, that he had done nothing wrong.  Nevertheless, PCA, with ill will, agreed to support Dear's and CalPERS' decision that Baez had to be forced out of his company or, alternatively, PCA's gross negligence and reckless and wanton disregard for the truth, in failing to properly conduct a due diligence investigation, as set forth herein, meant it lacked reasonable grounds for the belief of the truth about its statements to CalPERS about Baez, and thus acted maliciously in reckless disregard for Baez's rights and led to Baez's ouster.  Baez has not been able to find work since he was forced out of Centinela due to the reputational damage caused by his ouster.  In fact, as late as November 2016, another firm after advanced discussions specifically cited the CalPERS episode as a reason for not hiring Baez in a senior position.  At the age of 62, Baez has exhausted his savings, lines of credit, retirement account, and had to sell his home since PCA destroyed his business and reputation.

119.    Baez has suffered and continues to suffer significant damages as a result of PCA's tortious and illegal actions.  Those damages include a loss of salary for at least those years that he would have continued to be a partner in Centinela's management of the first two funds awarded to Centinela, a loss of 36.5% of the at least $14 million that he would have earned by creating a new fund with other institutional investors that he could not do because of PCA's misconduct and damage to his business, and $7.5 million for the reputational damage that he has suffered, inasmuch as CalPERS, based on PCA's recommendation, forced him to divest from Centinela and he is now unable to create a similar fund from scratch.  In addition, the damage Baez has suffered include a substantial decrease in Centinela's value due to, among other things, the loss of the Capital Link Fund III contract and the perceived instability of Centinela's management, as well as the failure of Centinela to obtain new mandates from other institutional investors, all of which resulted from Baez's departure.

120.    Baez had an expectancy in continuing and advantageous economic relations with Vargas, Taylor and the Centinela entities to which he was a party,

together with CalPERS and other funds.  Thus, these relationships contained the probability of future economic benefit in the form of the payment of a salary and other distributions to Baez through his ownership of the Centinela business, and particularly through the Centinela Investment Partners LLC Agreement, the Centinela Group LLC Agreement, and other agreements as well.  That future economic benefit included new business that Centinela would have attracted but for PCA's tortious, malicious and illegal acts, as demonstrated in part by the Separation Agreement:

### 4. Future Economic Participation.

Baez will be entitled to receive 15% of any carried interest distributions received by the Managing Directors that are earned from investment mandates secured by Centinela prior to the first anniversary of the date hereof from any of the following potential clients (each a "Specified Potential Client") (i) Michigan MERS, (ii) Employees' Retirement System of Rhode Island, and (iii) Teachers Retirement System of Texas. If the economics of any such arrangements with a Specified Potential Client are not structured through entities in which Baez continues to hold a direct or indirect interest after consummation of the arrangements contemplated herein, then appropriate provision shall be made to incorporate Baez into such new arrangements. For the avoidance of doubt, the interest of Baez in such carried interest distributions is subject to dilution and shall be reduced proportionately to the extent that the aggregate amount of carried interest distributions received by the Managing Directors from a Specified Potential Client is reduced by virtue of the grant or sale of membership or partnership interests in any entity directly or indirectly generating such distributions or economic interests therein to one or more employees, contractors or other persons or entities providing services or capital to Centinela Investment Partners, Centinela Holdings, Centinela Group, Centinela Capital Partners, or one or more of their respective affiliates. Baez shall not be required make a capital commitment in respect of the Specified Other Carried Interest but shall be required to agree to any clawback or similar obligation required by the investor at issue and to which the Managing Directors are also subject. Baez will expressly not participate in the economics or activities associated with any CalPERS' mandate other than the Legacy Funds as specified above.

### G. PCA Resigns As CalPERS' Private Equity Consultant

121.  On or about March 6, 2017, PCA suddenly resigned as CalPERS' Private Equity Consultant, effective March 16, 2017.  PCA's resignation came in the middle of

a five-year contract it had with CalPERS, which was not scheduled to end until June 30, 2020.  Neither PCA nor CalPERS provided a reason for PCA's resignation.

122.    Furthermore, when Baez subpoenaed PCA in the Baez CalPERS Action, PCA was represented with respect to that subpoena by the same counsel that was representing CalPERS in the Baez CalPERS Action.  When the facts as alleged in this Complaint became known, CalPERS' counsel suddenly withdrew as counsel for PCA.

123.    Upon information and belief, PCA was forced to resign by CalPERS as a result of the conduct described in this Complaint.

## FIRST CLAIM FOR RELIEF

### (Intentional Interference with Contractual Relations)

### (Against All Defendants)

124.    Baez repeats and realleges each of the allegations of the Complaint as though set forth in full herein.

125.    As set forth above, Baez was a party to the agreements governing Capital Link Fund I and Capital Link Fund II (meaning the agreements which entitled Baez to compensation from those Funds for the management and investment advisory services provided to them) described above.    These agreements include the Centinela Investment Partners LLC Agreement, the Centinela Group LLC Agreement, the Centinela Holdings, LLC Agreement, and the Centinela Capital Partners, LLC Agreement.

126.    PCA was aware of the Centinela Investment Partners LLC Agreement, the Centinela Group LLC Agreement, the Centinela Holdings, LLC Agreement, and the Centinela Capital Partners, LLC Agreement because those entities were an integral part of the structure of entities created to manage Capital Link Fund I and Capital Link Fund II and PCA reviewed those agreements during its due diligence.

127.    By recommending, either in conspiracy with CalPERS and Dear or independently, that Baez must be ousted and then rejecting the failsafe, PCA intended and knew that Baez would be removed from Centinela and that for Baez to be

terminated, Taylor and Vargas would have to terminate or otherwise breach the Centinela Investment Partners LLC Agreement and the Centinela Group LLC Agreement which is what ultimately gave Baez his rights to compensation and to participation in the management of all the other Centinela entities.  As a result, PCA's tortious acts disrupted Baez's contractual relationships under the Centinela Group LLC Agreement and the Centinela Investment Partners LLC Agreement in the following ways.

128.   First, by reason of the Separation Agreement, Baez's rights to "Carried Interest" from the Centinela Investment Partners LLC Agreement was cut off, other than that for Capital Link Funds I and II.  Second, the Separation Agreement cut off Baez's right to certain investment distributions.  Third, the Separation Agreement cut off Baez's rights to any other "Distributable Cash" of Centinela Investment Partners.  Fourth, the Separation Agreement cut off Baez's rights to certain Profits Interests distributions under the Centinela Group LLC Agreement.  Fifth, the Separation Agreement cut off Baez's rights to certain Distributable Cash under the Centinela Group LLC Agreement.  Sixth, Baez was deprived of salary and compensation.  Seventh, Baez was deprived of his membership interests in Centinela Group LLC and Centinela Investment Partners LLC, and reduced to nonvoting status with no rights to management.

129.   Similarly, PCA knew and intended that Baez's contractual relationship, through his indirect ownership of Centinela Holdings, LLC and Centinela Capital Partners, LLC, with CalPERS would be disrupted in many ways.  In particular, his right to "Carried Interest" and "Distributable Cash" and Profit Interests distributions which stemmed from his indirect ownership interest in Centinela Holdings, LLC and Centinela Capital Partners, LLC was cut off.  Indeed, he was deprived of his indirect ownership interests in Centinela Holdings, LLC and Centinela Capital Partners, LLC.

130.   To be clear, even though Baez nominally signed the Separation Agreement, he did so under duress, based on the threats by CalPERS that resulted from PCA's

conspiracy and/or recommendation to oust Baez. Thus, the Separation Agreement was merely the means by which PCA intentionally and purposely achieved its interference with, among other things, the Centinela Investment Partners LLC Agreement and the Centinela Group LLC Agreement. For this reason the Separation Agreement and the threats by CalPERS to Taylor and Vargas which PCA knew CalPERS would make once PCA raised an undefined fitness issue concerning Baez would cause the Separation Agreement to come about constitute the tortious interference in this case.

131. Thus, PCA's intentional acts in causing CalPERS to force Centinela to expel Baez were designed to, and did in fact, disrupt the contractual relationship between Baez, his partners and Centinela, as well as Baez and CalPERS.

132. As a direct and proximate result of the foregoing conduct, Baez has been harmed by PCA's tortious interference in an amount to be proven at trial, in excess of $30 million. In addition, because PCA's interference with Baez's contractual relations was willful, malicious, oppressive and in conscious and reckless disregard of Baez's clearly established rights, Baez is entitled to an award of punitive damages to punish PCA wrongful conduct and deter future wrongful conduct.

## SECOND CLAIM FOR RELIEF

### (Intentional Interference with Prospective Economic Advantage)

### (Against All Defendants)

133. Baez repeats and realleges each of the allegations of the Complaint as though set forth in full herein.

134. Baez had an established and long-standing economic relationship with his partners, Taylor and Vargas, and with Centinela. Indeed, Baez founded Centinela together with Taylor and Vargas. Moreover, it was Baez's work, among others, that led to the success of Capital Link Fund I and Capital Link Fund II. Baez was further instrumental in CalPERS' initial decision to award Capital Link Fund III to Centinela.

135. Baez had an expectancy in continuing and advantageous economic relations with Vargas, Taylor, and Centinela. Thus, these relationships contained the

probability of future economic benefit in the form of the payment of a salary and other distributions to Baez through his ownership of Centinela, and particularly through the Centinela Investment Partners LLC Agreement, the Centinela Group LLC Agreement, the Centinela Holdings, LLC Agreement, and the Centinela Capital Partners, LLC Agreement. Moreover, Baez and his partners would have been able to expand Centinela and thus bring more business and profits to Baez. For example, at about the time that Baez separated from Centinela Investment Partners LLC and Centinela Group LLC, Centinela and Baez had proposals that were extremely likely to have been accepted before public pension funds in Texas, Michigan and Rhode Island, among others, to manage funds in the $300 to $400 million range.

136.   Those new funds were documented in the Separation Agreement.

137.   Securing those funds would have resulted in additional salary payments, distributions and fees paid to Baez under the same structure that he was paid distributions under the Fund I and the Fund II Agreements, through the Centinela Group LLC Agreement, the Centinela Investment Partners LLC Agreement, the Centinela Holdings, LLC Agreement, and the Centinela Capital Partners, LLC Agreement.

138.   Thus, had PCA refrained from engaging in the unlawful and wrongful conduct described in this complaint, there is a substantial probability that Baez would have continued to work at Centinela and receive benefits from being a party to the Centinela Group LLC Agreement and the Centinela Investment Partners LLC Agreement, and having an indirect ownership interest in Centinela Holdings, LLC and Centinela Capital Partners, LLC.

139.   PCA knew of the relationships between Baez and his partners, Taylor and Vargas, as well as other states' pension funds, and intended to interfere with and disrupt these relationships by unlawfully and wrongfully forcing Baez to separate from Centinela.

140.   PCA's conclusions, made to support CalPERS' desire to oust Baez, that Baez had fitness issues and statements that Baez had lied to PCA gave CalPERS a

pretextual reason to make threats to Taylor and Vargas, and ultimately led to Baez's separation from Centinela through the Separation Agreement. More specifically, in conspiracy with CalPERS and Dear or to support their desire, by recommending that Baez should be ousted and then rejecting the failsafe, PCA knew that Baez would be removed from Centinela and that for Baez to be terminated, Taylor and Vargas would have to terminate or otherwise breach the Centinela Investment Partners LLC Agreement and the Centinela Group LLC Agreement which is what ultimately gave Baez his rights to compensation and to participation in the management of all the other Centinela entities. As a result, PCA's tortious acts disrupted Baez's contractual relationships under the Centinela Group LLC Agreement and the Centinela Investment Partners LLC Agreement in the following ways.

141. First, Baez's rights to "Carried Interest" from the Centinela Investment Partners LLC Agreement was cut off. Thus, the Separation Agreement deprived Baez of rights under, among other provisions, Section 4.2 of the Fund I LLC Agreement and Section 4.2 of the Fund II LLC Agreement, which would have been paid to Baez under the CIP LLC Agreement, which provided for the payment of carried interest distributions to the Centinela partners. Second, the Separation Agreement cut off Baez's right to certain investment distributions. Third, the Separation Agreement cut off Baez's rights to any other "Distributable Cash" of Centinela Investment Partners. Fourth, the Separation Agreement cut off Baez's rights to certain Profits Interests distributions under the Centinela Group LLC Agreement. Fifth, the Separation Agreement cut off Baez's rights to certain Distributable Cash under the Centinela Group LLC Agreement. Sixth, Baez was deprived of salary and compensation. Seventh, Baez was deprived of his membership interests in Centinela Group LLC and Centinela Investment Partners LLC, and reduced to nonvoting status with no rights to management.

142. PCA's conduct was independently wrongful in violation of California Constitution's ban of racial discrimination (Article I, Section 8), the California

MEYLAN DAVITT
JAIN AREVIAN & KIM LLP

Constitution's equal protection clause (Article I, Section 7(a)) to the extent PCA is an agent of CalPERS, and in any event under the Unruh Civil Rights Act (Cal. Civil Code Section 51).

143.  As set forth above, PCA conclusion that Baez posed a "reputational risk" was pre-ordained and PCA conducted its investigation to support that conclusion.  The conclusion that Baez would pose a reputational concern was based on an investigation into alleged misconduct by individuals (who were Latinos but otherwise had nothing to do with Baez) who allegedly misused their "insider" relationships to secure investments with CalPERS or the New York State pension fund for their clients.  Although neither PCA nor CalPERS alleged that Baez or Centinela had engaged in any illegal or improper activity (and they had not), or had even used the services of the "placement agents" under investigation (which they also had not), and despite the fact that the Khinda Report from the investigation by Steptoe and Johnson LLP that arose from the CalPERS pay-to-play scandal did not mention Baez or any other person affiliated with Centinela, PCA, in conspiracy with CalPERS and Dear or to support a result PCA knew Dear and CalPERS wanted, determined that CalPERS should, and CalPERS ultimately stated that it would, only continue to work with Centinela if Baez was forced out.  The fact that Baez is Latino, like the placement agents under investigation, played a major role in PCA's determination and CalPERS's decision to reverse itself and deny Centinela the new contract.  Thus, the motivating factor for the decision to force Centinela to expel Baez from his fund and to later not honor its commitment to form Capital Link Fund III was Baez's race, in violation of Article I, Sections 7(a) and 8 of the California State Constitution and in violation of the Unruh Civil Rights Act (Cal. Civil Code § 51).

144.  PCA's conduct was also independently wrongful in that it defamed Baez by telling CalPERS that Baez was being untruthful insofar as he was contradicted by Clark and was a "reputational concern".

145.   PCA's actions led to Baez being forced under duress to divest himself from Centinela and thus from the benefits he was due under Centinela Group LLC Agreement, the Centinela Investment Partners LLC Agreement, and indirectly, under the Centinela Holdings, LLC Agreement and the Centinela Capital Partners, LLC Agreement.   PCA's determination that Baez had to be forced from Centinela was designed to, and did, disrupt the relationship between Baez and his partners, Taylor and Vargas, as well as CalPERS, and other public pension funds in Texas, Michigan, and Rhode Island, among others.

146.   As a direct and proximate result of the foregoing conduct, Baez has been harmed by PCA's tortious interference in an amount to be proven at trial, in excess of $30 million.   In addition, because PCA's interference with Baez's prospective economic advantage was willful, malicious, oppressive and in conscious and reckless disregard of Baez's clearly established rights, Baez is entitled to an award of punitive damages to punish PCA's wrongful conduct and deter future wrongful conduct.

## THIRD CLAIM FOR RELIEF

### (Intentional Interference with Prospective Economic Advantage)

### (Against All Defendants)

147.   Baez repeats and realleges each of the allegations of the Complaint as though set forth in full herein.

148.   Baez had an expectancy in continuing and advantageous economic relations with CalPERS.   Thus, this relationship contained the probability of future economic benefit in the form of the payment of a salary and other distributions to Baez through his ownership of Centinela, and particularly through the Centinela Investment Partners LLC Agreement, the Centinela Group LLC Agreement, the Centinela Holdings, LLC Agreement, and the Centinela Capital Partners, LLC Agreement. Moreover, Baez and his partners would have been able to expand Centinela and thus bring more business and profits to Baez.   For example, at about the time that Baez

separated from Centinela Investment Partners LLC and Centinela Group LLC, Centinela
and Baez had proposals that were extremely likely to have been accepted before public
pension funds in Texas, Michigan and Rhode Island, among others, to manage funds in
the $300 to $400 million range.

149.    Those new funds were documented in the Separation Agreement.

150.    Securing those funds, as well as additional business from CalPERS, would
have resulted in additional salary payments, distributions and fees paid to Baez under
the same structure that he was paid distributions under the Fund I and the Fund II
Agreements, through the Centinela Group LLC Agreement, the Centinela Investment
Partners LLC Agreement, the Centinela Holdings, LLC Agreement, and the Centinela
Capital Partners, LLC Agreement.

151.    Thus, had PCA refrained from engaging in the unlawful and wrongful
conduct described in this complaint, there is a substantial probability that Baez would
have continued to work at Centinela and receive benefits from being a party to the
Centinela Group LLC Agreement and the Centinela Investment Partners LLC
Agreement, and having an indirect ownership interest in Centinela Holdings, LLC and
Centinela Capital Partners, LLC.

152.    PCA knew of the relationships between Baez and CalPERS, as well as
other states' pension funds, and intended to interfere with and disrupt these relationships
by unlawfully and wrongfully forcing Baez to separate from Centinela.

153.    PCA's conclusions, made to support CalPERS' desire to oust Baez, that
Baez had fitness issues and statements that Baez had lied to PCA gave CalPERS a
pretextual reason to make threats to Taylor and Vargas, and ultimately led to Baez's
separation from Centinela through the Separation Agreement.  More specifically, in
conspiracy with CalPERS and Dear or to support their desire, by recommending that
Baez should be ousted and then rejecting the failsafe, PCA knew that Baez would be
removed from Centinela and that for Baez to be terminated, Taylor and Vargas would
have to terminate or otherwise breach the Centinela Investment Partners LLC

Agreement and the Centinela Group LLC Agreement which is what ultimately gave Baez his rights to compensation and to participation in the management of all the other Centinela entities.   As a result, PCA's tortious acts disrupted Baez's contractual relationships under the Centinela Group LLC Agreement and the Centinela Investment Partners LLC Agreement in the following ways.

154.   First, Baez's rights to "Carried Interest" from the Centinela Investment Partners LLC Agreement was cut off.   Thus, the Separation Agreement deprived Baez of rights under, among other provisions, Section 4.2 of the Fund I LLC Agreement and Section 4.2 of the Fund II LLC Agreement, which would have been paid to Baez under the CIP LLC Agreement, which provided for the payment of carried interest distributions to the Centinela partners.   Second, the Separation Agreement cut off Baez's right to certain investment distributions.   Third, the Separation Agreement cut off Baez's rights to any other "Distributable Cash" of Centinela Investment Partners.   Fourth, the Separation Agreement cut off Baez's rights to certain Profits Interests distributions under the Centinela Group LLC Agreement.   Fifth, the Separation Agreement cut off Baez's rights to certain Distributable Cash under the Centinela Group LLC Agreement.   Sixth, Baez was deprived of salary and compensation.   Seventh, Baez was deprived of his membership interests in Centinela Group LLC and Centinela Investment Partners LLC, and reduced to nonvoting status with no rights to management.

155.   Similarly, PCA knew and intended that Baez's contractual relationship, through his indirect ownership of Centinela Holdings, LLC and Centinela Capital Partners, LLC, with CalPERS would be disrupted in many ways.   In particular, his right to "Carried Interest" and "Distributable Cash" and Profit Interests distributions which stemmed from his indirect ownership interest in Centinela Holdings, LLC and Centinela Capital Partners, LLC was cut off.   Indeed, he was deprived of his indirect ownership interests in Centinela Holdings, LLC and Centinela Capital Partners, LLC.

156.    PCA's conduct was independently wrongful in violation of California Constitution's ban of racial discrimination (Article I, Section 8), the California Constitution's equal protection clause (Article I, Section 7(a)) to the extent PCA is an agent of CalPERS, and in any event under the Unruh Civil Rights Act (Cal. Civil Code Section 51).

157.    As set forth above, PCA conclusion that Baez posed a "reputational risk" was pre-ordained and PCA conducted its investigation to support that conclusion.    The conclusion that Baez would pose a reputational concern was based on an investigation into alleged misconduct by individuals (who were Latinos but otherwise had nothing to do with Baez) who allegedly misused their "insider" relationships to secure investments with CalPERS or the New York State pension fund for their clients.    Although neither PCA nor CalPERS alleged that Baez or Centinela had engaged in any illegal or improper activity (and they had not), or had even used the services of the "placement agents" under investigation (which they also had not), and despite the fact that the Khinda Report from the investigation by Steptoe and Johnson LLP that arose from the CalPERS pay-to-play scandal did not mention Baez or any other person affiliated with Centinela, PCA, in conspiracy with CalPERS and Dear or to support a result PCA knew Dear and CalPERS wanted, determined that CalPERS should, and CalPERS ultimately stated that it would, only continue to work with Centinela if Baez was forced out.    The fact that Baez is Latino, like the placement agents under investigation, played a major role in PCA's determination and CalPERS's decision to reverse itself and deny Centinela the new contract.    Thus, the motivating factor for the decision to force Centinela to expel Baez from his fund and to later not honor its commitment to form Capital Link Fund III was Baez's race, in violation of Article I, Sections 7(a) and 8 of the California State Constitution and in violation of the Unruh Civil Rights Act (Cal. Civil Code § 51).

158.   PCA's conduct was also independently wrongful in that it defamed Baez by telling CalPERS that Baez was being untruthful insofar as he was contradicted by Clark and was a "reputational concern".

159.   PCA's actions led to Baez being forced under duress to divest himself from Centinela and thus from the benefits he was due under Centinela Group LLC Agreement, the Centinela Investment Partners LLC Agreement, and indirectly, under the Centinela Holdings, LLC Agreement and the Centinela Capital Partners, LLC Agreement.   PCA's determination that Baez had to be forced from Centinela was designed to, and did, disrupt the relationship between Baez and CalPERS, and other public pension funds in Texas, Michigan, and Rhode Island, among others.

160.   As a direct and proximate result of the foregoing conduct, Baez has been harmed by PCA's tortious interference in an amount to be proven at trial, in excess of $30 million.  In addition, because PCA's interference with Baez's prospective economic advantage was willful, malicious, oppressive and in conscious and reckless disregard of Baez's clearly established rights, Baez is entitled to an award of punitive damages to punish PCA's wrongful conduct and deter future wrongful conduct.

## FOURTH CLAIM FOR RELIEF

### (Negligent Interference with Prospective Economic Advantage)

### (Against All Defendants)

161.   Baez repeats and realleges each of the allegations of the Complaint as though set forth in full herein.

162.   Baez had an established and long-standing economic relationship with his partners, Taylor and Vargas, and with Centinela, as well as CalPERS.  Indeed, Baez had founded Centinela together with Taylor and Vargas.  Moreover, it was Baez's work, among others, that led to the success of Capital Link Fund I and Capital Link Fund II. Baez was further instrumental in CalPERS' initial decision to award Capital Link Fund III to Centinela.

163.   Baez had an expectancy in continuing an advantageous economic relations with Vargas, Taylor and Centinela, and CalPERS.  Thus, these relationships contained the probability of future economic benefit in the form of the payment of a salary and other distributions to Baez through his ownership of Centinela, and particularly through the Centinela Investment Partners, LLC Agreement, the Centinela Group, LLC Agreement, the Centinela Holdings, LLC Agreement, and the Centinela Capital Partners, LLC Agreement.  Moreover, Baez and his partners would have been able to expand Centinela and thus bring more business and profits to Baez. For example, at about the time that Taylor and Vargas expelled Baez from Centinela Investment Partners LLC and Centinela Group LLC, Centinela and Baez had proposals that were extremely likely to have been accepted before public pension funds in Texas, Michigan and Rhode Island, among others, to manage funds in the $300 to $400 million range, which funds were documented in the Separation Agreement:

### 4.    Future Economic Participation.

Baez will be entitled to receive 15% of any carried interest distributions received by the Managing Directors that are earned from investment mandates secured by Centinela prior to the first anniversary of the date hereof from any of the following potential clients (each a "Specified Potential Client") (i) Michigan MERS, (ii) Employees' Retirement System of Rhode Island, and (iii) Teachers Retirement System of Texas. If the economics of any such arrangements with a Specified Potential Client are not structured through entities in which Baez continues to hold a direct or indirect interest after consummation of the arrangements contemplated herein, then appropriate provision shall be made to incorporate Baez into such new arrangements. For the avoidance of doubt, the interest of Baez in such carried interest distributions is subject to dilution and shall be reduced proportionately to the extent that the aggregate amount of carried interest distributions received by the Managing Directors from a Specified Potential Client is reduced by virtue of the grant or sale of membership or partnership interests in any entity directly or indirectly generating such distributions or economic interests therein to one or more employees, contractors or other persons or entities providing services or capital to Centinela Investment Partners, Centinela Holdings, Centinela Group, Centinela Capital Partners, or one or more of their respective affiliates. Baez shall not be required make a capital commitment in respect of the Specified Other Carried Interest but shall be required to agree to any clawback or similar obligation

1
2

> required by the investor at issue and to which the Managing
> Directors are also subject. Baez will expressly not participate
> in the economics or activities associated with any CalPERS'
> mandate other than the Legacy Funds as specified above.

3     164.   Securing those funds, as well as additional business from CalPERS, would

4  have resulted in additional salary payments, distributions and fees paid to Baez.  Thus,

5  had PCA refrained from engaging in the unlawful and wrongful conduct described in

6  this complaint, there is a substantial probability that Baez would have continued to work

7  at Centinela and receive benefits from that work.

8     165.   PCA knew or should have known about the economic relationships

9  between Baez and his partners, Taylor and Vargas, as well as CalPERS and other states'

10  pension funds, described above, and knew or should have known that these relationships

11  would be interfered with and disrupted if PCA failed to act with reasonable care in

12  conducting due diligence with respect to Centinela and Baez.  PCA failed to act with

13  reasonable care and instead acted with reckless disregard for Baez's rights.  It relied

14  upon a source that PCA knew or should have known was unreliable and was easily

15  discreditable.  Further, PCA wrongfully linked Baez to the individuals suspected of

16  alleged misconduct without justification because Baez and the suspect individuals were

17  Latino and did so because it knew Dear needed a pretext to oust Baez.

18     166.   PCA's conclusions, made to support CalPERS' desire to oust Baez or

19  alternatively grossly negligently and with reckless and wanton disregard for the truth,

20  that Baez had fitness issues and statements that Baez had lied to PCA gave CalPERS a

21  pretextual reason to make threats to Taylor and Vargas, and ultimately led to Baez's

22  separation from Centinela through the Separation Agreement.  More specifically, in

23  conspiracy with CalPERS and Dear or to support their desire to oust Baez, or

24  alternatively in grossly negligent and reckless fashion, by recommending that Baez

25  should be ousted and then rejecting the failsafe, PCA knew that Baez would be removed

26  from Centinela and that for Baez to be terminated, Taylor and Vargas would have to

27  terminate or otherwise breach the Centinela Investment Partners LLC Agreement and

28  the Centinela Group LLC Agreement which is what ultimately gave Baez his rights to

1   compensation and to participation in the management of all the other Centinela entities.

2   As a result, PCA's tortious acts disrupted Baez's contractual relationships under the

3   Centinela Group LLC Agreement and the Centinela Investment Partners LLC

4   Agreement in the following ways.

5       167.   First, Baez's rights to "Carried Interest" from the Centinela Investment

6   Partners LLC Agreement was cut off.   Thus, the Separation Agreement deprived Baez

7   of rights under, among other provisions, Section 4.2 of the Fund I LLC Agreement and

8   Section 4.2 of the Fund II LLC Agreement, which would have been paid to Baez under

9   the CIP LLC Agreement, which provided for the payment of carried interest

10  distributions to the Centinela partners.   Second, the Separation Agreement cut off

11  Baez's right to certain investment distributions.   Third, the Separation Agreement cut

12  off Baez's rights to any other "Distributable Cash" of Centinela Investment Partners.

13  Fourth, the Separation Agreement cut off Baez's rights to certain Profits Interests

14  distributions under the Centinela Group LLC Agreement.    Fifth, the Separation

15  Agreement cut off Baez's rights to certain Distributable Cash under the Centinela Group

16  LLC Agreement.   Sixth, Baez was deprived of salary and compensation.   Seventh, Baez

17  was deprived of his membership interests in Centinela Group LLC and Centinela

18  Investment Partners LLC, and reduced to nonvoting status with no rights to

19  management.

20      168.   Similarly, PCA knew and intended that Baez's relationship, through his

21  indirect ownership of Centinela Holdings, LLC and Centinela Capital Partners, LLC,

22  with CalPERS, as well as others states' pension funds, would be disrupted in many

23  ways.   In particular, his right to "Carried Interest" and "Distributable Cash" and Profit

24  Interests distributions which stemmed from his indirect ownership interest in Centinela

25  Holdings, LLC and Centinela Capital Partners, LLC was cut off.   Indeed, he was

26  deprived of his indirect ownership interests in Centinela Holdings, LLC and Centinela

27  Capital Partners, LLC.

28

169.  PCA's conduct was independently wrongful in violation of the California Constitution's ban on racial, ethnic and national origin discrimination in the pursuit of a business or profession (Article I, Section 8), the California Constitution's general equal protection clause (Article I, Section 7(a)), to the extent PCA is an agent of CalPERS, and in any event under the Unruh Civil Rights Act (Cal. Civil Code Section 51).

170.  As set forth above, PCA conclusion that Baez posed a "reputational risk" was pre-ordained and PCA conducted its investigation to support that conclusion.  The conclusion that Baez would pose a reputational concern was based on an investigation into alleged misconduct by individuals (who were Latinos but otherwise had nothing to do with Baez) who allegedly misused their "insider" relationships to secure investments with CalPERS of the New York State pension fund for their clients.  Although neither PCA nor CalPERS alleged that Baez or Centinela had engaged in any illegal or improper activity (and they had not), or had even used the services of the "placement agents" under investigation (which they also had not), and despite the fact that the Khinda Report conducted by Steptoe and Johnson LLP did not mention Baez or any other person affiliated with Centinela, PCA determined in conspiracy with CalPERS and Dear or to support a result PCA knew Dear and CalPERS wanted, and CalPERS ultimately stated, that it would only continue to work with Centinela if Baez was forced out.  The fact that Baez is Latino, like the placement agents under investigation, played a major role in PCA's and CalPERS' determination that Baez should be ousted and CalPERS's decision to reverse itself and deny Centinela the new contract.  Thus, the motivating factor for the decision to force Centinela to expel Baez from his fund and to later not honor its commitment to form Capital Link Fund III was Baez's race, in violation of Article I, Sections 7(a) and 8 of the California State Constitution and in violation of the Unruh Civil Rights Act (Cal. Civil Code § 51).

171.  PCA's conduct was also independently wrongful in that it defamed Baez by telling CalPERS that Baez was being untruthful insofar as he was contradicted by Clark and was a "reputational concern".

172.   As a direct and proximate result of the foregoing conduct, Baez has been harmed by PCA's negligent interference in an amount to be proven at trial, in excess of $30 million.  In addition, because PCA's interference with Baez's prospective economic advantage was willful, malicious, oppressive and in conscious and reckless disregard of Baez's clearly established rights, Baez is entitled to an award of punitive damages to punish PCA's wrongful conduct and deter future wrongful conduct.

## FIFTH CLAIM FOR RELIEF

### (Violation of Article I, Section 7(a) (Equal Protection) of the California Constitution)

### (Against All Defendants)

173.   Baez repeats and realleges each of the allegations of the Complaint as though set forth in full herein.

174.   At all relevant times, CalPERS used a variety of investment advisors and managers to manage its billions of dollars in assets.  Some companies that served as CalPERS' investment advisors were minority owned, like Centinela, and some were not.  Likewise, some individual investment managers affiliated with the companies that contracted with CalPERS as investment advisors were minorities, like Baez and his partners Taylor and Vargas, and some were not.

175.   Baez produced excellent results for CalPERS through Capital Link Fund I and Capital Link Fund II.

176.   Baez was not mentioned in the Khinda Report and had never been alleged, by anyone, to have participated in the CalPERS placement agent scheme that was being investigated by the California Attorney General, or indeed in any wrongful conduct.  Some of the placement agents being investigated were Latino or had Latino-sounding names.

177.   Thus, Baez was similarly situated to non-Latino investment managers who produced excellent (or at least good) results for CalPERS and were not involved in the placement agent scandal or other alleged wrongdoing.

178.   Based on his Latino lineage, however, Defendants drew a distinction between Baez and those similarly situated non-Latino investment managers who produced good results and were not implicated in wrongdoing relating to CalPERS. Defendants, in conspiracy with CalPERS or to support its desire, ousted Baez from Centinela because they improperly assumed that his Latino ethnicity implicated him in the placement agent scandal; yet CalPERS did not, nor did Defendants recommend, that CalPERS oust similarly situated non-Latino investment managers from their firms.

179.   Baez's Latino lineage is a suspect classification.  Accordingly, Defendants' conspiracy to oust Baez from Centinela while not ousting similarly situated investment managers—*i.e.*, those that generated good results for CalPERS and were not implicated in the placement agent scheme or other wrongdoing—is subject to strict scrutiny, and is unlawful under the California Constitution's general equal protection clause unless Defendants show that ousting Baez was an action that was precisely tailored to serve a compelling governmental interest.

180.   However, there is no even arguable governmental interest in ousting a successful Latino investment manager from the firm he founded and through which he earned his livelihood when he engaged in no wrongdoing, and was not even alleged, by anyone, to have engaged in any wrongdoing, while not ousting similarly situated non-Latino investment managers from their firms.

181.   As detailed above, Baez was severely and irreparably harmed by Defendants' conduct.  His business was destroyed and his reputation sullied for no reason and as a result he has been forced out of his chosen profession—one in which through hard work and talent he became successful.

## SIXTH CLAIM FOR RELIEF

### (Negligent Supervision)

### (Against PCA)

182.   Baez repeats and realleges each of the allegations of the Complaint as though set forth in full herein.

183.  Defendant PCA hired Moy.

184.  CalPERS wanted to oust Baez and that there was pressure from CalPERS to support this desire.

185.  PCA knew or should have known that this was the most or one of the most complex investigations Moy had ever been involved in.

186.  PCA knew or should have known that CalPERS was applying pressure to reach a certain result.

187.  Given that this was the most or one of the most complex investigations Moy had ever been involved in and that CalPERS was applying pressure to support its desire to oust Baez, such facts, individually or together, would have warned a reasonable person that Moy presented an undue risk of harm in light of the particular work to be performed.

188.  Thus, PCA knew or should have known they had to supervise Moy accordingly and were under a legal duty to use due care.

189.  PCA failed to supervise Moy in any way.

190.  Moy was therefore able to collude with CalPERS, or otherwise support the result PCA knew CalPERS and Dear wanted, by providing CalPERS with a "recommendation" to oust Baez from Centinela, when in reality, the "recommendation" was nothing more than a pre-ordained conclusion supported by purported statements that were never made or verified from a negligently or intentionally shoddy investigation.

191.  Moy's complicity with CalPERS and Dear in providing them the necessary cover to oust Baez harmed Baez by, and was a substantial factor, resulting in his separation from Centinela.

192.  In the alternative, PCA's failure to supervise Moy in any way led to Moy's conducting a due diligence investigation that was well below the level of professionalism and standards commonly held by those in the profession, and indeed

reckless, which resulted in PCA's recommendation that CalPERS' demand Baez's ouster from Centinela.

193.    As a direct and proximate result of the foregoing conduct, Baez has been harmed by PCA's negligent supervision in an amount to be proven at trial, in excess of $30 million.

## SEVENTH CLAIM FOR RELIEF

### (Defamation)

### (Against All Defendants)

194.    Baez repeats and realleges each of the allegations of the Complaint as though set forth in full herein.

195.    Defendants authored and/or published the false and defamatory statements concerning Plaintiff, namely that Baez had lied and that he had been contradicted by a source.  The defamatory statements of fact were published to Dear and other individuals at CalPERS, and thus to persons other than Plaintiff.

196.    In particular, Defendants wrote "[a]n off-reference call, who has requested anonymity, gave us some input which caused us to seek elaboration from Cesar Baez with respect to his former employers and some of his personal relationships.  Cesar's input contradicted that received in the reference call."  They also wrote that he was a "reputational concern."

197.    Defendants authored and/or published the false and defamatory statements with actual malice or reckless and wanton disregard for their truth.  Defendants also acted negligently.

198.    The defamatory statements constitute defamation per se because they falsely accuse Plaintiff of committing of improper conduct in his business and trade.

199.    Plaintiff is not a public figure.

200.    The publications were neither privileged nor authorized by Plaintiff.

201.    In publishing the false and defamatory statements, Defendants acted in a grossly irresponsible manner without due consideration for the standards of information

gathering and dissemination ordinarily followed by responsible parties and with a reckless and wanton disregard for the truth.

202.  Special damages are not required to be alleged in this case given the kind of false statements made, however, as set forth above, the defamatory and libelous statements have injured Plaintiff in their good name and reputation as individuals and also in their business, and caused them to suffer damages in an amount to be proven at trial, in excess of $30 million.

## EIGHTH CLAIM FOR RELIEF

### (Negligence)

### (Against All Defendants)

203.  Baez repeats and realleges each of the allegations of the Complaint as though set forth in full herein.

204.  Defendants owed a duty to Baez, as a foreseeable plaintiff, to perform the due diligence investigation of Baez and Centinela in accordance with the level of professionalism and standards commonly held by those in the profession.

205.  Defendants breached that duty by conducting PCA's due diligence investigation in a manner that was well below the level of professionalism and standards commonly held by those in the profession, which resulted in PCA's recommendation that CalPERS' demand Baez's ouster from Centinela.

206.  Defendants lacked reasonable grounds for the recommendation and acted in reckless disregard of Baez's rights.

207.  As a direct and proximate result of the foregoing conduct, Baez has been harmed by Defendants' negligence in that he was forced out of Centinela under a cloud, and in an amount to be proven at trial, in excess of $30 million.

# NINTH CLAIM FOR RELIEF

## (Gross Negligence)

## (Against All Defendants)

208.   Baez repeats and realleges each of the allegations of the Complaint as though set forth in full herein.

209.   Defendants owed a duty to Baez, as a foreseeable plaintiff, to perform the due diligence investigation of Baez and Centinela in accordance with the level of professionalism and standards commonly held by those in the profession.

210.   Defendants breached that duty by conducting PCA's due diligence investigation in a manner that was well below the level of professionalism and standards commonly held by those in the profession, which resulted in PCA's recommendation that CalPERS' demand Baez's ouster from Centinela.

211.   Defendants lacked reasonable grounds for the recommendation and acted in reckless disregard of Baez's rights.  Defendants' due diligence was either without even scant care or constituted an extreme departure from the ordinary standard of conduct.

212.   As a direct and proximate result of the foregoing conduct, Baez has been harmed by Defendants' negligence in that he was forced out of Centinela under a cloud, and in an amount to be proven at trial, in excess of $30 million.

WHEREFORE, Plaintiff Baez prays for judgment against Defendants, as follows:

1.      For compensatory damages in an amount to be proven at trial in excess of $30 million and for interest thereon at the highest lawful rate;

2.      For punitive damages;

3.      For Baez's costs of suit incurred herein;

4.      For attorneys' fees;

5.      For injunctive relief precluding Defendants from discriminating against others as it did Baez and any other orders to remedy the harms caused by Defendants' unlawful conduct in violation of Baez's equal protection rights.

1    6.    For such other and further relief as the Court may deem just and proper.

2

3    DATED: March 10, 2017    MEYLAN DAVITT JAIN AREVIAN & KIM LLP

4    SCHLAM STONE & DOLAN LLP

5

6    By:    /s/ Benedetto L. Balding

7    Robert L. Meylan

8    Benedetto L. Balding
     Attorneys for Plaintiff Cesar Baez

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEYLAN DAVITT
JAIN AREVIAN & KIM LLP

*COMPLAINT*

1  ## DEMAND FOR JURY TRIAL

2  Plaintiff hereby demands a jury trial on all counts asserted against Defendants.

3

4  DATED:  March 10, 2017          MEYLAN DAVITT JAIN AREVIAN & KIM LLP

5                                                        SCHLAM STONE & DOLAN LLP

6

7

8  By:    _/s/  Benedetto L. Balding_

9            Robert L. Meylan

           Benedetto L. Balding

10          Attorneys for Plaintiff Cesar Baez

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28